THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RANDALL LEE DEMPSEY, Defendant-Appellant.

Fifth District   No. 5—91—0033

Opinion filed March 19, 1993.

Daniel M. Kirwan and Edwin J. Anderson, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Charles Garnati, State's Attorney, of Marion (Norbert J. Goetten, Stephen E. Norris, and Kendra S. Mitchell, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE WELCH delivered the opinion of the court:

Defendant, Randall Lee Dempsey, appeals from his convictions and sentences for the offenses of aggravated criminal sexual assault and criminal transmission of HIV. He was charged by amended information, filed in the circuit court of Williamson County on July 2, 1990, with the offenses of: criminal transmission of HIV in that on or about May 27 or 28, 1990, with knowledge that he was infected with HIV, defendant engaged in intimate contact with the victim; and aggravated criminal sexual assault in that on or about the same date, while over 17 years of age, defendant knowingly committed an act of sexual penetration with the victim, who was under 13 years of age, in that defendant placed his penis in the mouth of the victim. Following a jury trial, held October 10, 11 and 12, 1990, defendant was convicted on both counts. His sentencing hearing was held December 27, 1990. The circuit court of Williamson County sentenced defendant to seven years' imprisonment on his conviction for criminal transmission of HIV and to an extended term of 33 years' imprisonment on his conviction for aggravated criminal sexual assault, and ordered the sentences to run concurrently.

The following evidence was adduced at defendant's trial. The victim testified that he was nine years old and his birthday was July 18. He resides with his mother and father. The victim stated he has two brothers, and he stated their names. The victim identified one of his brothers, Randy, the defendant, in the courtroom. The victim testified that he also has two sisters, and he stated their names. He testified he attends third grade, and he named the school and his teacher.

The victim was shown a doll and asked to identify certain body parts thereon. He identified hair, eyes, mouth and "bottom." He indicated that he knew what "private parts" were and, when asked to

identify them on the doll, pointed to and touched the penis. When asked if anybody had ever touched his private parts, he responded that his brother Randy had. Using the doll, he demonstrated that Randy had touched his penis. When asked whether Randy had done anything else to him that he did not like, the victim testified that Randy had also placed a penny in his ear and he had not liked it. The victim was asked if Randy had done anything else that he did not like, and the victim said "no."

When asked whether Randy had put anything in his mouth, the victim stated, "He put that in my mouth," pointing to the penis on the doll. With his finger, the victim demonstrated that Randy's penis was erect when Randy put it in his mouth. Snot came out of Randy's penis; it was soft and tasted "yukky." The victim spit the snot out in a trash can.

Randy indicated that he would give the victim a turtle. Randy told the victim not to tell his mom. The incident occurred when Randy and the victim were in bed in Randy's room at their mother's house. The victim talked to his mother, about what had happened, on the porch and in the car when they went for a drive. He told her the truth in the car, and he was telling the truth in court. He testified that he still loved Randy.

On cross-examination, the victim testified that he and Randy had separate bedrooms at their mother's house. Randy never baby-sat for the victim. Randy had just moved back into his mother's house around Christmas. He often played soccer and baseball with Randy. He was rarely alone with Randy. When asked if Randy ever touched or hurt him in any way, the victim responded that he had when the victim slept in Randy's bed, but no other time. The victim testified that on the night of the offense, it had been his idea to sleep with Randy. He got permission from both of his parents. The victim was wearing ninja turtle sleepwear that night. The trash can into which the victim spit the semen was in the "liberty room." The victim testified that the night before the incident, Randy had put a penny in his ear. The victim denied that Randy had a gumball machine or any gum. The offense occurred in the morning. The victim testified that it was light outside and that the clock said 1:30 in the morning.

The victim stated that immediately after the offense, he went and told his mother on the back porch. His mother then took him for a drive. When he returned, his father asked him about the offense and he denied that it had happened. He stated that he spoke with his father in the car while his mother was present. The victim insisted that Randy had committed the offense.

The victim's mother is the one who disciplines him. The victim testified that he has a gumball machine in his room. It has different colored gumballs in it. When the victim gets a gumball he does not like, he spits it out in the trash can. Randy sometimes gave the victim pennies to put in the machine. The victim then stated that he had never gotten a gumball he did not like and had never spit one out. In response to leading questions, the victim testified that Randy had given him a penny to put in the gumball machine, he had gotten a white gumball that he did not like and he had spit it out into a waste can.

On redirect examination, it was established that the victim did not know when the month of May was, he did not know what "immediately" meant, but he knew a gumball was not the same thing as snot. The victim could not explain what the "liberty room" was. When asked if he knew the difference between the truth and a lie, the victim said he did not. He did state, however, that if you tell a lie you "go down there to the devil," and he pointed his finger downward. He stated that he did not know the meaning of the word "difference." The liberty room contains the washing machine. This concluded the victim's testimony.

Outside the presence of the jury, defendant made a motion to strike the victim's testimony for the reason that the evidence showed that he was not competent to testify. Defendant argued that when asked whether he knew the difference between the truth and a lie, the victim had said he did not. The prosecutor argued that the victim did know what a lie was and the consequence of telling one, but that he had not understood the questions he was asked by the attorneys. He pointed out that the victim had said he did not understand the word "difference." The victim did state that when you tell a lie, you go to the devil, indicating that he knew it was wrong to tell a lie. It was up to the jury to weigh the child's testimony. The prosecutor also pointed out that defendant had not asked for a competency hearing prior to the child's testimony. Defendant responded that he was not limited in making a motion to strike the child's testimony but could do so after that testimony.

The court ruled that a witness is presumed to be competent and it appeared that the victim simply did not understand some of the questions which were posed to him by the attorneys. The court found that the child was capable of communicating on the level of a child. It was up to the jury to evaluate the weight to be given the child's testimony. The court found the witness to be competent and denied defendant's motion to strike his testimony.

At this point, the State called several witnesses who testified that blood samples were taken of the defendant at Marion Memorial Hospital, that those samples were tested for presence of the human immunodeficiency virus (HIV) and that all tests showed a positive result. The witnesses testified to the procedures used in drawing, handling and testing the blood samples and established a chain of custody of the blood samples to demonstrate that it was the defendant's blood which was tested.

The mother of the victim and of the defendant testified that she has three sons and two daughters. The defendant was born January 30, 1956, and the victim was born July 18, 1981. Randy had been born in California and had lived in California until November 1989. At that time, Randy moved to Marion to live with his parents. He was quite ill. He arrived in Marion a few days before Thanksgiving. He was taken immediately to the emergency room at Marion Memorial Hospital. He was subsequently hospitalized there, and blood tests were run to determine if he was infected with HIV.

Randy's physician was Dr. Hyde. In December 1989, Dr. Hyde met with Randy, his mother (the witness), his sister and her husband and explained Randy's condition. At this time, Randy was living at the home of his parents. Randy was prescribed medication and at first took it regularly. After time, he became very lax in taking it. Randy, his mother and father, and the victim lived together in a three-bedroom house. Randy and the victim had separate bedrooms. On only one occasion did the mother allow Randy and the victim to sleep in the same room, and that is the night that the offense occurred. It was Memorial Day weekend, 1990. The mother explained that she had come home from church that evening feeling tired and she had gone to bed. She heard Randy and the victim in the hall playing and making noise. She got out of bed and told them to be quiet. The victim told her that he was going to sleep with Randy. She did not object. The victim slept in Randy's room. The mother felt that Randy and the victim were close and that the victim loved Randy. The mother testified that the victim is in third grade and attends special-education classes.

The morning after the victim slept in Randy's room, the mother got up first. The victim then got up. The mother noticed that the victim was very quiet, that he refused breakfast and that he did not act like himself. The mother was concerned and took the victim out on the back porch to question him. He refused to tell her what was wrong. Eventually, the victim told the mother that he and Randy had a secret. The mother told the victim that she wanted to know his se-

cret, but he refused to tell her. He told her that he had promised Randy that he would not tell. They remained on the porch for 10 minutes. The mother told the victim to get dressed because she wanted to take him away from the house and talk to him. They drove a short distance from the house, and the mother stopped the vehicle. The victim still did not want to tell her his secret. She threatened to spank him if he did not tell her. The victim then told his mother that Randy had put his "peenie" in his mouth. The mother asked him if he meant a penny and the victim said no. She then asked him if he meant a penis, and the victim said yes and pointed to his genital area. The victim told the mother that Randy got snot in his mouth and he did not like it. The victim said that he spit it out in the yellow trash can. There is a yellow trash can in the laundry room. The victim stated that Randy had promised to take him turtle hunting if he kept their secret.

The mother then took the victim home, where she confronted Randy. Randy denied the offense. The victim looked at Randy and said, "You did do it, Randy." The father of the victim and Randy then took the victim out on the back porch and talked to him. When they came back in, the victim stated that the offense had not happened. The mother then dropped it.

Later that week, the mother began to question the victim again about the incident. She finally told the victim that Randy was very sick and could die, and that if the offense occurred, the victim might also get sick. The mother knew that the victim was frightened of death. She told the victim that he might also die. The victim then told her that the incident did happen as he had originally told her. The victim knew that the incident was causing some upset in the family. The mother explained that the trash can into which the victim spit the semen had had a liner in it, and the liner had been placed out for trash pickup. She did not look in it for evidence to corroborate the victim's accusation.

On cross-examination, the mother testified that Randy had been married in California, but that he was separated from his wife when he moved to Illinois. After being treated by Dr. Hyde, Randy's condition dramatically improved. His condition continued to improve up until April 1990; he was not sick. In the spring of 1990, Randy moved out of his parents' home for a week and stayed with his sister, who also lived in the area. He then moved back in with his parents. He got a job. Having Randy in the home did create some burden and tension in the family.

The night of the offense, the mother, her husband and the victim went to church. They returned home around 10 p.m. She went to bed

shortly thereafter, while the rest of the family remained up. She heard Randy and the victim playing and scuffling in Randy's room. She got up and told them to quiet down. The victim told her he was going to sleep in Randy's room that night.

The next morning, the mother was the first to awaken. The victim got up a few minutes later and began watching television. He refused breakfast and said that he had a stomach ache. He was very quiet and was not himself. When she talked with the victim on the porch she was rather stern with him. When they went for a drive, she threatened several times to spank him if he did not tell her what had happened. The mother frequently spanked the victim. When the mother confronted Randy with the victim's accusation, Randy angrily denied it. The yellow trash can was in the laundry room down the hall from Randy's room. The week after the incident, the mother questioned the victim about it three times. Although the victim had told other people that the incident had not occurred, he never told the mother that it had not occurred.

After seeing Dr. Hyde, Randy's condition began to improve and it continued to improve through the spring. He appeared to have recovered. The mother did not believe that Randy was a homosexual or a pedophile and had never seen any evidence of either tendency. She had never seen any evidence that Randy was sexually attracted to the victim. The victim had not been tested for HIV. Randy had been dating women since he returned to Illinois.

On redirect examination, the mother explained that she intended to have the victim tested for HIV at the appropriate time. She testified that she disapproved of the homosexual lifestyle and it was unlikely that Randy would display that type of behavior around her.

Randy's physician, Dr. Thomas P. Hyde, was called to testify. Prior to his testimony, the prosecutor filed a petition with the court asking that Dr. Hyde be authorized to give testimony regarding the medical condition and treatment of defendant. The prosecutor indicated that Dr. Hyde's testimony was necessary to prove that defendant had knowledge that he was infected with HIV, an essential element of the offense of criminal transmission of HIV. The prosecutor also argued that the physician-patient privilege should not bar Dr. Hyde's testimony in that the case arose out of a report of child abuse, one of the statutory exceptions to the privilege. Defendant argued that he had not waived the privilege and that the statutory exception did not apply. The court found that there was a compelling need for Dr. Hyde's testimony to prove defendant's knowledge of his infection and authorized his testimony, overruling defendant's objection.

Dr. Hyde testified that he is an internal medical doctor, an oncologist and a hemotologist. As a hemotologist, he specializes in diagnosing disorders of the blood. He has treated patients with HIV. Dr. Hyde treated defendant for HIV. He met with defendant and defendant's mother, sister-in-law and brother on December 2, 1989, at Marion Memorial Hospital. Defendant denied any of the risk factors for HIV. Dr. Hyde explained to defendant that he was potentially infectious to others through transmission of body fluids. Dr. Hyde met again with defendant and his family members on December 12, 1989. Defendant was advised that his second blood test had also come back positive for HIV and that he was certainly infected. Defendant was prescribed AZT and an antibiotic. AZT is the only approved treatment for HIV. Defendant was again advised that he was potentially infectious to others.

Dr. Hyde testified that HIV can be transmitted through blood, vaginal secretions and semen. The virus had also been found in spinal fluid, saliva and tears, but it was not likely that it could be transmitted through these fluids.

Dr. Hyde never told defendant that he was no longer infected with HIV. Defendant remains infected with HIV.

On cross-examination, Dr. Hyde testified that defendant's condition improved after he began treatment with AZT. Defendant was advised that he needed to continue taking the AZT. He had none of the complications of AIDS. Defendant told Dr. Hyde that he thought he was getting better. Defendant had indicated to his mother that he thought he was cured.

Jesse Crider, a child-protective investigator for the Department of Children and Family Services, testified that he is charged with investigating reports of child neglect and abuse. He investigated the allegations in the instant case. He interviewed the victim on June 4, 1990, at the victim's residence. Also present during the interview was Detective McCluskey of the Williamson County sheriff's department. The victim was advised that he was not in trouble and had not done anything wrong.

Crider first determined that the victim knew the difference between the truth and a lie. Crider then showed the victim a drawing of a body and, pointing to various body parts, asked the victim to name them. The victim identified hair, eyes, nose, mouth, belly button and butt. He had no name for breast or penis. Crider then asked the victim if he knew what private parts were. The victim said yes and pointed to the groin and buttocks. Crider asked the victim whether anyone had ever touched him in a private part, and the victim said

that his brother Randy had. The victim indicated using the drawing that Randy had touched his penis. When asked whether Randy had done anything else, the victim stated that Randy put his penis in the victim's mouth, pointing to the penis on the drawing. The victim stated that snot came out of the penis, that it was slicky and slimy and that he spit it out. Using his index finger to indicate an erect or limp penis, Crider asked the victim what position Randy's penis had been in. The victim indicated that the penis was erect. The victim said that this occurred in Randy's bedroom on Randy's bed. Randy told the victim that it was their secret and that he should not tell. If the victim kept the secret, Randy would get him a turtle or take him turtle hunting. The victim told Crider that he spit the "snot" out in a trash can in the bedroom. On cross-examination, Crider testified that the victim said the incident happened on the night he slept with Randy.

Sergeant Robert McCluskey of the Williamson County sheriff's department testified that he was present during the interview of the victim on June 4, 1990. His testimony corroborated that of Crider. The victim indicated that Randy had been wearing undershorts the night of the offense.

Outside the presence of the jury, defense counsel made a motion to exclude the testimony of the State's next witness, a psychologist, Virginia Hoffman. Defendant argued that Hoffman had never treated, counseled or otherwise seen the victim, and therefore her testimony was irrelevant and immaterial. The prosecutor indicated that he was calling Hoffman to testify as an expert about a post-traumatic stress syndrome often suffered by victims of sexual abuse, as allowed by statute. The court denied defendant's motion and allowed the witness to testify.

Virginia Hoffman testified that she is the senior counseling psychologist at the counseling center at Southern Illinois University. She also has a contract with the Department of Children and Family Services to work with intrafamilial sexual abuse. She is a licensed psychologist in the State of Illinois. Hoffman discussed her educational and employment background and experience at length. She was qualified as an expert witness in the field of child sexual abuse syndrome.

Hoffman was asked about post-traumatic stress syndrome and explained that it is the aftereffects of suffering trauma. It may manifest itself through flashbacks, nightmares, and with a child it might result in a recurrence of earlier behaviors such as bedwetting. Children who have been sexually abused may suffer from a form of the syndrome, and this theory is accepted in the psychological community.

Hoffman was then asked about the child sexual abuse accommodation syndrome. She explained that the first characteristic of this syndrome is secrecy. Sexual abuse almost always happens in secret, and the child understands that it is a secret he or she must keep. The child will keep the secret both to protect himself and sometimes to protect the offender.

Another characteristic of the syndrome is helplessness. Children are naturally helpless. They do not have words for things and have little or no understanding of sex. They are helpless to question or object to the abuse, and they trust the person who is abusing them.

The third characteristic which has been studied and documented in literature is referred to as entrapment and accommodation. The abuser will win the child's trust and confidence through apparently innocent activities and then keep the child entrapped through the secret. The child accommodates the abuse by not telling and by surviving it and allowing it to continue.

The fourth characteristic of the syndrome is delayed and unconvincing disclosure. The child will tell about the abuse in bits and pieces over a period of time. A child who tells the whole story of abuse in a coherent way is often suspected of having been coached or set up by a parent. Children are usually very unconvincing and confused in telling about the abuse. Because they have no prior knowledge or experience of sex, they have no way of organizing the information. Being pushed may be as important to a child as being sexually penetrated. Children tend to make omissions in telling about the abuse.

The fifth characteristic of the syndrome is retraction. When the disclosure of intrafamilial abuse is made, it is overwhelming to the family. The child begins to notice that it is upsetting to the family and so retracts the story. The child thinks that if he or she takes it back, the family will be okay. Children are also protective of the offender, who is a trusted family member.

The syndrome deals with intrafamilial abuse. It is based on observations of thousands and thousands of cases over a number of years in a whole variety of settings all over the country.

On cross-examination, Hoffman testified that she had never evaluated the victim. The child sexual abuse accommodation syndrome was first published in 1982, and there has been ongoing literature and continued investigation and evaluation in this field.

At this point, the State rested its case. Defendant's motion for a directed verdict was denied.

The defendant called Jesse Crider to testify. He testified that prior to interviewing the victim on June 4, 1990, he interviewed the mother. Also present was Detective McCluskey of the Williamson County sheriff's department. Crider was not sure whether the mother told him that the victim had said defendant put a "penny" or "peenie" in his mouth. His report originally contained the word "peenie," but he later changed it to "penny." He was not sure why he changed it.

Sergeant Robert McCluskey testified for defendant that his report contained the word "penny," that is, that the victim had told his mother that defendant put a penny in his mouth.

One of the sisters of the defendant and the victim testified. She was present on most occasions when defendant met with Dr. Hyde. Randy first saw Dr. Hyde at the end of November and last saw him in the middle of April. The sister testified that Dr. Hyde told them that once Randy's blood count went down, it would never come back up. However, Randy's blood tests showed that his blood count had come back up. Dr. Hyde never explained this apparent inconsistency, although he was asked about it several times. On cross-examination, the sister testified that she was present on two occasions when Randy was told he was infected with HIV.

Defendant's father testified that he is also the victim's father. The night of the offense, the mother was the first to go to bed. Randy also went to bed. The victim asked his father if he could sleep with Randy. The father told the victim to ask his mother, and his mother consented. The father awakened the next morning and found the mother and the victim awake. Randy was still sleeping. The mother and the victim left for about 20 minutes that morning. When they returned, Randy was up. The mother asked the father to take a ride with her and the victim, which he did. When they returned, the mother confronted Randy with the victim's accusation. Randy denied it. The father took the victim out on the porch to talk to him. The mother and Randy had been arguing about a penny. The father asked the victim to explain to him about the penny. The victim told the father that he had gotten some gum, that it had tasted "yuckie" and that he had spit it out in the trash can. The victim started crying and told his father that he was in trouble because Randy had not done anything to him. The father called the mother out on the porch, and the victim told her that Randy had not done anything to him. The mother took the victim inside and made him apologize to Randy. The victim told Randy that he did not do it and that he was sorry. During that week, the victim was consistent that Randy had not done any-

thing to him. On Saturday, the victim changed his story again. However, since then, the victim has told the father two or three times that Randy did not do anything to him. On cross-examination, the father admitted that when he was interviewed by Sergeant McCluskey on June 5, 1990, he did not tell McCluskey that the victim had said anything about getting a gumball and it tasting "yuckie."

Defendant testified in his own behalf. He is 34 years of age. He testified that Dr. Hyde explained to him that HIV attacks your blood and if the white blood cells are destroyed they can never replace themselves. In November, defendant's white blood cell count was very low, but in February or March it had improved to a normal level. When defendant asked Dr. Hyde about this, Hyde said he had no explanation. Defendant last saw Dr. Hyde in late March. From February to the present, defendant has felt very good.

Defendant testified that there is no trash can in his bedroom. The victim has a gumball machine in his room. On the night of the offense, Randy had gone to bed when the victim came in and asked Randy if he could sleep with him. Randy agreed. The victim told Randy that their mother had said it was okay. Before they went to sleep that night, the victim asked Randy if Randy would get him a turtle. They then went to sleep. The next morning, the victim got up while Randy was still sleeping. The victim came into the room and stuck a penny on Randy's face while Randy was sleeping. Randy woke up, took the penny off his face and stuck it on the victim's tongue. Randy told the victim to use the penny to get a gumball out of the machine. The victim left and Randy went back to sleep.

When Randy got up, the mother and the victim were gone from the house. When they returned, the mother asked Randy if he had put his penis in the victim's mouth. Randy said no. In court, Randy denied that he had ever touched the victim's penis with his hand or that he had ever put his penis in the victim's mouth.

On cross-examination, defendant testified that he had been advised by Dr. Hyde that he had tested positive for HIV. At the end of December, Hyde prescribed AZT for defendant. Defendant took the AZT in January but over the next few months took less and less of it. In April he was hardly taking any of it. At the time of trial, defendant was taking AZT while incarcerated in jail. Defendant testified that on the date of the offense, he was feeling so good, he did not actually believe that he was infected with HIV. Dr. Hyde had never told defendant that he was cured of the infection. Defendant admitted that when he was interviewed by Sergeant McCluskey on June 7,

1990, he did not tell McCluskey anything about the victim sticking a penny on his face.

This concluded the evidence. After due deliberation, the jury returned verdicts of guilty on both counts.

Defendant's first argument on appeal is that the trial court erred in failing to determine the child witness' competency as a witness prior to his testimony and in failing to strike the witness' testimony when his incompetency later became apparent. At the time of trial, the child witness, the victim, was nine years of age. A statute then in effect, section 106A—5 of the Code of Criminal Procedure of 1963, required that before allowing a child witness under the age of 12 years to testify in a sexual assault case, the court must first determine *in camera* the child's competency to testify. (Ill. Rev. Stat. 1989, ch. 38, par. 106A—5.) There is no question in the case at bar that the trial court failed to hold such an *in camera* competency hearing. However, also in effect at the time of defendant's trial was section 115—14 of the Code of Criminal Procedure of 1963, which provides that every person, regardless of age, is qualified to be a witness, but that a party may move the court prior to a witness' testimony to request that the court make a determination if the witness is competent to testify. (Ill. Rev. Stat. 1989, ch. 38, par. 115—14.) The State argues that this statute controls over section 106A—5 because section 106A—5 was repealed by the legislature effective January 1, 1992 (Pub. Act 87—345, eff. January 1, 1992). The State argues that the fact that section 106A—5 conflicted with section 115—14 and was subsequently repealed indicates that the legislature did not intend to require a judicial determination of the competency of child witnesses unless one of the parties challenged the child's competency before the testimony was heard. Therefore, the State argues, the trial court did not err in failing to conduct a competency hearing in the absence of a motion by defendant. Furthermore, the State argues, the repeal of section 106A—5 should be applied retroactively. The State argues that we should apply the law as it exists today, reminding us that section 115—14 does not require a pretrial competency hearing in the absence of a motion by a party. Thus, the State argues, applying section 115—14, the trial court did not err in failing to hold a competency hearing pretrial where defendant neither moved for such a hearing nor filed a motion *in limine* to exclude the child's testimony.

■ While we find the State's argument interesting, we have no need to determine whether the trial court erred in failing to conduct a pretrial competency hearing for, where the witness is properly found competent to testify after a motion to strike his testimony, there can

be no prejudice to defendant as a result of the failure to hold a pretrial competency hearing. Thus, we find that even if the trial court erred in failing to hold a pretrial competency hearing pursuant to section 106A—5, the error was harmless if the child witness was properly found competent to testify following defendant's motion to strike the witness' testimony. We turn then, to the question of whether the witness was properly found to be competent to testify.

Defendant correctly argues that a witness is incompetent to testify if he is incapable of understanding the duty to tell the truth. (Ill. Rev. Stat. 1989, ch. 38, par. 115—14(b)(2).) The victim was asked the following questions and gave the following answers regarding his understanding of the duty of a witness to tell the truth:

"Q. Do you know the difference between the truth and a lie ***?

A. No.

Q. You don't?

A. (Nods negatively.)

Q. Well what happens if you tell a lie?

A. You go down there to the devil. (Witness points finger down.)

Q. Do you know, when I say the word 'difference', do you know what that means. Do you know what the word 'difference' means?

A. No.

Q. So where do you go if you tell a lie?

A. You go to the devil.

Q. Okay, and like you said, your Mom would be the one that spanked you if you told a lie, right?

A. Yeah.

Q. So, do you try to tell your Mom the truth?

A. Yes."

Following this testimony, defendant moved to strike the victim's testimony. After having seen the witness testify, the court found that he was competent to testify and that it was for the jury to evaluate the weight to be given his testimony.

The question of a witness' competency is to be determined by the trial judge, and a reviewing court may not disturb such a determination unless it is clear that the trial judge abused his discretion or misapprehended some legal principle. (*People v. Mack* (1991), 216 Ill. App. 3d 239, 245, 576 N.E.2d 1023, 1027.) As the court expressed in *Mack*, the cold black and white of the record is a poor substitute for the personal observation of the fact finder in determining competency.

The demeanor of the witness, while apparent to the trial court, is hidden from a court of review. Thus, while decisions as to competency of a witness are reviewable, in light of the trial court's opportunity to take into account the demeanor, appearance and conduct of the witness at trial, competency determinations will be overturned only when it appears that the trial judge has abused his discretion. *People v. Garcia* (1983), 97 Ill. 2d 58, 75, 454 N.E.2d 274, 280; *People v. Williams* (1991), 147 Ill. 2d 173, 212-18, 588 N.E.2d 983, 997.

Furthermore, it is not necessary for the child to give perfect answers to questions asked during the competency determination or at trial to be deemed a competent witness. (*People v. Mitchell* (1991), 215 Ill. App. 3d 849, 857, 576 N.E.2d 78, 84.) One imperfect response to a question would not invalidate a finding of competency in light of what is indicated by the totality of the responses. (*People v. Born* (1987), 156 Ill. App. 3d 584, 588-89, 509 N.E.2d 125, 127.) As the prosecutor explained in the instant case, some of the problems with the victim's testimony were a result of the phrasing of the questions asked of him and not of his incompetency. The victim testified that he knew that if he told a lie he would "go to the devil," indicating his understanding that it was morally wrong, or sinful, to tell a lie. The victim also understood that he might be spanked if he told a lie to his mother. As expressed in *People v. Ridgeway* (1990), 194 Ill. App. 3d 881, 885, 551 N.E.2d 790, 792:

> "The record in the present case indicates the great difficulty in dealing with young children as witnesses. Children are necessary witnesses in most cases involving sexual abuse of youngsters. Such wrongful conduct takes place in secrecy and the evidence, other than the child's complaints, is often limited. The child witness is placed in front of strange faces and required to relate unpleasant encounters. The court appearance itself is a traumatic experience. Previous decisions of the appellate and supreme courts are little help in deciding the issue now presented to us. Each case rests on its own facts, and each child is different. In this case, the trial judge finally cut through the contradictions created by the examination by the State and the defense. He observed the *** boy, heard his responses, and decided that his testimony on the crucial issue would be competent. We cannot say his decision was an abuse of discretion. We are fully aware of the value of the actual observation of the child in the courtroom in making competency decisions of this kind."

A trial court may determine a witness' competency to testify by observing the witness' demeanor and ability to testify during trial. (*People v. Ford* (1985), 139 Ill. App. 3d 894, 901, 488 N.E.2d 573, 578.) While we think a more in-depth hearing into the witness' competency in the instant case may have been desirable, we do not think the deficiencies in the victim's testimony are sufficient for us to substitute our judgment for that of the trial judge who observed the witness. The trial court did not err in finding the victim competent to testify, and defendant was not prejudiced by the trial court's failure to hold a pretrial competency hearing.

Defendant's second argument on appeal is that his convictions must be reversed because the evidence was insufficient to prove him guilty beyond a reasonable doubt where the victim recanted his accusations and was not a competent and credible witness regarding the alleged sexual assault. Defendant argues that the victim's repeated denials that the sexual assault occurred make his testimony that he was assaulted unworthy of belief. We note that evidence of the victim's denials that the assault occurred was before the jury, as was his testimony that it did occur. Thus, the jury was aware of not only the existence of the recantation but also its substance. It is well settled that the determination of a witness' credibility is exclusively within the province of the jury, and it is for the jury to resolve any conflicts in the evidence. *People v. Collins* (1985), 106 Ill. 2d 237, 261-62, 478 N.E.2d 267, 277.

The jury in the instant case was fully advised as to the circumstances under which the victim made his accusations and the circumstances under which he recanted them. The jury chose to believe the victim's trial testimony that he was sexually assaulted, and after reviewing the entire record on appeal, we are not prepared to say that the jury's conclusion is unreasonable. The victim's testimony at trial was corroborated by similar statements he had made to his mother and investigators Crider and McCluskey. The jurors may have disbelieved the evidence of recantation for several reasons: they may have disbelieved the witnesses who testified to the recantation because, although the witnesses were certainly concerned with the victim's best interests, they also had an interest in seeing the defendant acquitted and freed to return to them, his family; or, if they believed those witnesses, they could have believed that the victim's recantation, motivated by a desire to end the distress in his family and have his beloved brother returned to the household, was false. The victim was surely aware that defendant was in jail as a result of his accusation and that his entire family was upset. Both of the victim's parents

testified that he loved his brother, the defendant. The victim's motivation to falsely recant is evident.

In the instant case, the evidence of the witness' recantation was before the jury, just as was the evidence of the witness' accusation. The jury was in the best position to evaluate the credibility of the witness and determine whether to believe his accusation or his recantation. A reviewing court may only disturb the jury's finding as to credibility when the evidence is so improbable or unsatisfactory as to raise a reasonable doubt of guilt. (*People v. McCarthy* (1981), 102 Ill. App. 3d 519, 522, 430 N.E.2d 135, 137.) The jury's determination in the instant case is reasonably supported by the evidence, and we will not disturb it on review.

We point out that this is not the typical recantation case, where the recantation occurs after defendant's conviction and is never presented to the jury. In such a case, the recantation is relied upon to urge a new trial for the defendant. It has long been recognized that evidence of recantation is inherently unreliable and insufficient to warrant a new trial. (*People v. Marquis* (1931), 344 Ill. 261, 265, 176 N.E. 314, 315.) A court will usually deny a new trial based on the ground of recanted testimony where it is not satisfied that such testimony is true. (*Marquis*, 344 Ill. at 265, 176 N.E. at 315.) Only in extraordinary and unusual cases will recanting testimony of witnesses be regarded as sufficient ground for a new trial. (*Marquis*, 344 Ill. at 265, 176 N.E. at 315.) This remains the law to date. *People v. Dotson* (1987), 163 Ill. App. 3d 419, 422, 516 N.E.2d 718, 721.

While further evidence of the victim's recantation was adduced at the hearing on defendant's post-trial motion for a new trial, including evidence that the victim had told his mother and sister that he had lied at trial, the trial court did not err in denying defendant's motion for a new trial based on this recanting testimony. The victim himself did not testify at the post-trial motion hearing and recant his trial testimony. The jury had already heard of the victim's recantations and had determined not to believe that evidence but instead to believe the victim's testimony at trial. The trial judge, as finder of fact at the post-trial motion hearing, was charged with determining the credibility of this recanting testimony. (*Collins*, 106 Ill. 2d at 261-62, 478 N.E.2d at 277.) Again, we will not disturb his determination where it is reasonably supported by the evidence.

■ Defendant also argues that he was not proved guilty beyond a reasonable doubt where the victim was not a competent witness, rendering his testimony and the evidence of his corroborating hearsay statements to his mother, Crider, and McCluskey inadmissible. We

have already discussed the competency of the victim to testify and found that he was competent and that his testimony was properly admitted. Defendant's instant argument with respect to the sufficiency of the evidence must, therefore, fail.

Defendant's next argument relates to the admissibility of the testimony of the State's expert witness, Virginia Hoffman. Defendant first argues that her testimony as to child sexual abuse accommodation syndrome was improperly admitted because no sufficient foundation was established to demonstrate the reliability of the evidence. Defendant argues that section 115—7.2 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1989, ch. 38, par. 115—7.2) requires that before evidence of any post-traumatic stress syndrome, including child sexual abuse accommodation syndrome, may be admitted, it must be demonstrated that the syndrome is recognized and accepted as valid by experts in the field. Defendant argues that although Hoffman testified that child sexual abuse accommodation syndrome is documented in the field of psychology as a form of post-traumatic stress syndrome, there still remains a great deal of controversy in the field of psychology as to the validity of the syndrome. Therefore, defendant argues, Hoffman's testimony was not sufficient to establish the recognition and acceptance of the syndrome as valid.

In *People v. Nelson* (1990), 203 Ill. App. 3d 1038, 561 N.E.2d 439, this court recognized the admissibility of evidence regarding the child sexual abuse syndrome, also known as the child sexual abuse accommodation syndrome, in the face of defendant's argument that the syndrome was not recognized in the field of psychology. This court found that the syndrome is indeed recognized in the field of psychology, although it may not be accepted by all psychologists. In *People v. Wasson* (1991), 211 Ill. App. 3d 264, 270, 569 N.E.2d 1321, 1326, this court again recognized that child sexual abuse accommodation syndrome is a recognized and accepted form of post-traumatic stress disorder. (See also *People v. Pollard* (1992), 225 Ill. App. 3d 970, 589 N.E.2d 175.) Thus, evidence of the syndrome is admissible under section 115—7.2 of the Code of Criminal Procedure of 1963.

However, defendant also argues that Hoffman never testified that the syndrome is recognized and accepted, and therefore the State failed to establish a proper foundation for admission of the evidence in the case at bar. This is especially so, argues defendant, where there remains great controversy in the field of psychology over the validity and reliability of the syndrome.

We think that a sufficient foundation was presented in the instant case to allow Hoffman to testify to the general characteristics of child

sexual abuse accommodation syndrome. Hoffman testified that it is a form of post-traumatic stress syndrome and that the theory is accepted in the psychological community. She explained the components of the syndrome. She testified that the syndrome has been documented in literature and is based on observations of thousands and thousands of cases over a number of years in a variety of settings all over the country. The syndrome was first published in 1982, and there has been ongoing literature and continued investigation and evaluation in this field. Defendant presented no evidence that the syndrome is not a recognized form of post-traumatic stress syndrome. We find, therefore, that an adequate foundation was laid for Hoffman's testimony.

Defendant also argues that the evidence was improperly admitted during the State's case in chief rather than in its rebuttal case. In *People v. Nelson*, this court held that evidence of child sexual abuse accommodation syndrome is admissible by the State only in rebuttal after the victim's credibility has first been attacked. (*Nelson*, 203 Ill. App. 3d at 1045, 561 N.E.2d at 444.) The State responds that although Hoffman did testify as the State's last witness in its case in chief, it was after the victim's credibility had been attacked by defendant through cross-examination. In that cross-examination of the victim and his mother, it was revealed that the victim had recanted his accusation against defendant. The State argues that it need not wait until its rebuttal case to admit evidence of the syndrome where that evidence may explain a recantation which was revealed in cross-examination during the State's case in chief. The State argues:

> "The logical extension of defendant's interpretation of the Court's language [in *Nelson*] would allow a defendant to successfully attack the credibility of a child victim during cross-examination of the State's witnesses, but preclude the State from rebutting such attacks by not eliciting testimony that the child had recanted or delayed reporting the incident during the defendant's portion of the case. There is no basis in *Nelson* for supposing that this Court intended to impose so severe a restraint."

In *Nelson*, after ruling that evidence of child sexual abuse accommodation syndrome is admissible, we stated:

> "At this time, we choose to limit the admissibility of such testimony to rebuttal after the victim's credibility has first been attacked. Under such circumstances, defendant's own actions have necessitated the use of syndrome testimony, especially when defense counsel emphasizes some unusual aspect of the

victim's behavior such as recantation or delayed reporting. [Citations.] To prohibit syndrome testimony in these instances would, in effect, for example in the situation of recantation, allow powerful impeachment evidence to remain unrebutted when a plausible reason exists why the jury should not give such impeachment the same weight as most prior inconsistent statements. [Citation.] At the same time, however, admission of syndrome testimony on rebuttal, even if believed, would not be dispositive of the case, thereby ensuring defendant a fair trial." 203 Ill. App. 3d at 1045, 561 N.E.2d at 444.

We note that in cases decided subsequent to *Nelson*, evidence of child sexual abuse accommodation syndrome was presented in the State's case in chief with no apparent objection by defendant and no assignment of error on appeal. (*People v. Wasson* (1991), 211 Ill. App. 3d 264, 569 N.E.2d 1321; *People v. Pollard* (1992), 225 Ill. App. 3d 970, 589 N.E.2d 175.) In those cases, it was pointed out that the trier of fact is not precluded from weighing the expert witness' credibility, nor is the trier of fact obligated to openly accept the witness' opinion. (*Wasson*, 211 Ill. App. 3d at 272, 569 N.E.2d at 1327; *Pollard*, 225 Ill. App. 3d at 978, 589 N.E.2d at 181.) We also note that section 115—7.2 of the Code of Criminal Procedure of 1963, which explicitly makes expert testimony relating to post-traumatic stress syndrome admissible, does not by its language limit its admission only to the State's rebuttal case. Ill. Rev. Stat. 1989, ch. 38, par. 115—7.2.

■ Because the law regarding admission of testimony of this nature has now been more fully developed than at the time we decided *Nelson*, we choose now to hold that evidence of child sexual abuse accommodation syndrome is admissible in the State's case in chief but only where the defendant, through cross-examination of the State's witnesses, has first attacked the credibility of the victim by introducing evidence of recantation, delayed reporting, inconsistencies, or other means of impeachment which may be explained in part by evidence of the child sexual abuse accommodation syndrome. As the State persuasively argues, to hold otherwise would allow the defendant to attack the victim's credibility on cross-examination in the State's case, and by refraining from impeaching the victim in defendant's own case, the defendant could preclude the State from introducing evidence of the syndrome in rebuttal. Thus, the State would have no opportunity to rehabilitate its witness through introduction of evidence of the syndrome. We further think that our holding is consistent with our statement in *Nelson* that to prohibit syndrome testimony in these instances would allow powerful impeachment evidence to re-

main unrebutted when a plausible reason exists why the jury should not give such impeachment the same weight as most prior inconsistent statements. We do not think this will unduly prejudice defendant for, as we explained in *Nelson*, it is only the defendant's own actions which will necessitate the use of the syndrome testimony. The evidence will not be admissible simply to bolster the victim's testimony unless the victim's credibility has first been brought into question.

In the instant case, the subject of the victim's recantation was first raised by defendant in his cross-examination of the victim during the State's case in chief. Accordingly, in the instant case, we find no error in the admission during the State's case in chief of evidence of the child sexual abuse accommodation syndrome.

Defendant's fourth argument on appeal is that his conviction for criminal transmission of HIV must be vacated because the statute upon which it is based, section 12—16.2(a)(1) of the Criminal Code of 1961 (Ill. Rev. Stat. 1989, ch. 38, par. 12—16.2(a)(1)), is unconstitutionally vague and therefore invalid. Section 12—16.2 provides in pertinent part as follows:

> "Criminal Transmission of HIV. (a) A person commits criminal transmission of HIV when he or she, knowing that he or she is infected with HIV:
>
> (1) engages in intimate contact with another;
> * * *
> (b) For purposes of this Section:
> 'HIV' means the human immunodeficiency virus or any other identified causative agent of acquired immunodeficiency syndrome.
>
> 'Intimate contact with another' means the exposure of the body of one person to a bodily fluid of another person in a manner that could result in the transmission of HIV.
> ***
> (c) Nothing in this Section shall be construed to require that an infection with HIV has occurred in order for a person to have committed criminal transmission of HIV." Ill. Rev. Stat. 1989, ch. 38, par. 12—16.2.

Defendant argues that the statute is unconstitutionally vague because the term "bodily fluid" is insufficiently defined and that, because the use of the word "could" in the definition of intimate contact encompasses such a broad range of conduct, it fails to clearly indicate what behavior is prohibited. As a result, the term "intimate contact with another" is not adequately defined and is vague. Defendant argues that because the term "bodily fluid" is not defined, the jury

could conclude that saliva and tears could transmit the virus, when experts in the field assert that these are not bodily fluids capable of transmitting the virus. Furthermore, because the word "could" encompasses such a broad range of conduct, a jury could conclude that some sexual act short of penetrative oral, anal or vaginal intercourse could transmit the virus when experts assert that only these penetrative sexual acts could transmit the virus. Defendant further argues that one must speculate whether biting or spitting on another while knowingly infected with HIV constitutes criminal transmission of HIV because the statute does not define what bodily fluids are possible transmitters of the virus. Defendant argues that these uncertainties in the statute render it unconstitutionally vague in that it fails to give adequate notice to as to what acts are prohibited and allows arbitrary and discriminatory application.

■ Defendant's argument must fail because, not only does he lack standing to raise the constitutionality of the statute as applied to other acts and actors, the statute is not vague and unconstitutional as applied to him. It is well settled that vagueness challenges to statutes which do not involve first amendment freedoms must be examined in light of the facts of the case at hand. (*People v. Jihan* (1989), 127 Ill. 2d 379, 385, 537 N.E.2d 751, 754.) Thus, to prevail in a vagueness challenge to a statute that does not implicate first amendment concerns, a party must demonstrate that the statute is vague as applied to the conduct for which the party is being prosecuted. (*Jihan*, 127 Ill. 2d at 385, 537 N.E.2d at 754.) The party must show that the statute did not provide clear notice that the party's conduct was prohibited. (*Jihan*, 127 Ill. 2d at 385, 537 N.E.2d at 754.) The right to challenge a statute as being vague on its face where the statute clearly applies to the conduct of the party making the challenge does not exist unless first amendment concerns are involved. *Jihan*, 127 Ill. 2d at 386, 537 N.E.2d at 754.

In the instant case, defendant does not argue, nor could he successfully argue, that any first amendment rights are implicated. Thus, defendant must demonstrate that the statute is vague not as applied to someone else, or some act other than that which he committed, but as applied to him and the act he committed. Thus, the issue before us is whether the statute clearly proscribed the conduct engaged in by defendant in this case.

A statute need only be sufficiently certain to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by law. (*People v. Lowe* (1990), 202 Ill. App. 3d 648, 653, 560 N.E.2d 438, 441.) A person should not be subjected to a penalty for

certain conduct unless the words of the statute clearly describe the conduct prohibited. (*People v. Taylor* (1990), 138 Ill. 2d 204, 211, 561 N.E.2d 667, 670.) However, a defendant may be prosecuted under a statute without violating his right of due process if his conduct falls squarely within the statute's proscriptions, even though the statute may be vague as applied to other conduct. (*Taylor*, 138 Ill. 2d at 211, 561 N.E.2d at 670.) The fact that there may be borderline cases wherein a degree of uncertainty exists as to the applicability of a statute does not render the statute unconstitutional as to conduct about which no uncertainty exists. *People v. Witzkowski* (1972), 53 Ill. 2d 216, 219, 290 N.E.2d 236, 239.

In the instant case, defendant placed his penis in the mouth of the victim and ejaculated semen. Defendant acknowledges that semen is a bodily fluid well known as a transmitter of HIV. Oral sexual intercourse is a penetrative sexual contact which is recognized as allowing transmission of the virus. Thus, defendant clearly exposed the body of another to his bodily fluid in a manner that could result in the transmission of HIV. A penal statute need only convey sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices. (*Taylor*, 138 Ill. 2d at 217, 561 N.E.2d at 673.) Defendant's conduct clearly fell within the proscription of the statute. Section 12—16.2(a)(1) is not unconstitutionally vague as applied to defendant in this case, and defendant has no standing to raise the constitutionality of the statute as it may be applied to other individuals and other acts.

Defendant's next argument on appeal is that the testimony of defendant's physician, Dr. Hyde, was improperly admitted in that the physician-patient privilege barred his testimony and no exception to that privilege applied. The State sought to introduce Dr. Hyde's testimony to establish that defendant had knowledge that he was infected with HIV, an essential element of the offense of criminal transmission of HIV. The court allowed Dr. Hyde to testify over defendant's objection, finding that there was a compelling need for the testimony. Defendant argues that the trial court improperly allowed Dr. Hyde to testify over defendant's assertion of the physician-patient privilege.

The physician-patient privilege is established by statute as follows:

> "No physician or surgeon shall be permitted to disclose any information he or she may have acquired in attending any patient in a professional character, necessary to enable him or her professionally to serve such patient ***." (Ill. Rev. Stat. 1989, ch. 110, par. 8—802.)

The statute sets forth several exceptions to the privilege, among them the following:

> "(4) in all actions brought by or against the patient, his or her personal representative, a beneficiary under a policy of insurance, or the executor or administrator of his or her estate wherein the patient's physical or mental condition is an issue, *** (7) in actions, civil or criminal, arising from the filing of a report in compliance with the 'Abused and Neglected Child Reporting Act.' " (Ill. Rev. Stat. 1989, ch. 110, par. 8—802.)

Neither party argues that Dr. Hyde's testimony does not fall within the scope of the physician-patient privilege. At trial, however, the State argued that exception (7) to the privilege applies because the prosecution arose from the filing of a report of child abuse in compliance with the Abused and Neglected Child Reporting Act (Ill. Rev. Stat. 1989, ch. 23, par. 2051 *et seq.*). On appeal, the State argues that not only does exception (7) apply but exception (4) also applies in that defendant's physical condition is in issue. The State also argues on appeal that, in any event, defendant had waived the privilege prior to trial in that, with defendant's consent, several of his relatives, including his mother and sister, had been present when Dr. Hyde discussed with defendant his HIV status, his condition and his treatment.

■ We find it unnecessary to decide whether defendant had waived the privilege or whether any exceptions to the privilege apply because we find that any error in the admission of the testimony was harmless. Dr. Hyde's testimony regarding defendant's medical condition and treatment was essentially cumulative to that given by defendant's mother and sister and by the defendant himself. Defendant's mother testified for the State that upon returning to Marion, defendant's blood was tested for HIV. The mother was present in Dr. Hyde's office when Dr. Hyde informed defendant that he was infected with HIV and prescribed medication for the condition. Defendant cross-examined the mother at length about defendant's treatment with Dr. Hyde. One of defendant's sisters testified in the defendant's case that defendant was treated by Dr. Hyde and that defendant had frequent blood tests performed. The sister was present on two separate occasions when Dr. Hyde explained to defendant that his blood tests indicated he was positive for HIV. She testified that defendant had been prescribed AZT, a drug commonly prescribed for HIV. Finally, defendant himself testified to his medical condition and his treatment by Dr. Hyde. Defendant gave blood samples to be tested for HIV. Defendant was advised that the first blood test had been positive for HIV. Defendant was advised that he was infected with HIV.

Defendant was prescribed AZT to fight the infection. Defendant knew that AZT was prescribed to people infected with HIV. Dr. Hyde never told defendant that he was cured. Numerous witnesses also testified to the taking of blood samples from defendant, the testing of those samples for HIV, and the positive results of those tests.

Dr. Hyde's testimony did not differ from that of the other witnesses and did not add anything that was not otherwise in evidence. Accordingly, we find that his testimony was essentially cumulative, and its admission, if error, was harmless and did not deprive defendant of a fair trial. See *Gord Industrial Plastics, Inc. v. Aubrey Manufacturing, Inc.* (1984), 127 Ill. App. 3d 589, 592, 469 N.E.2d 389, 392; *Stromquist v. Burlington Northern, Inc.* (1983), 112 Ill. App. 3d 37, 45, 444 N.E.2d 1113, 1119; *Charles Selon & Associates, Inc. v. Estate of Aisenberg* (1981), 103 Ill. App. 3d 797, 800, 431 N.E.2d 1214, 1216.

■ Defendant's sixth argument on appeal is that his conviction for criminal transmission of HIV must be vacated because it is based on the same physical act as is his conviction for aggravated criminal sexual assault. Defendant argues that his conviction for criminal transmission of HIV is based upon the defendant having placed his penis in the victim's mouth knowing he was HIV positive, thereby exposing the victim to the virus. That act, defendant argues, is the same act which resulted in his conviction for aggravated criminal sexual assault. Defendant is wrong. Defendant's conviction for criminal transmission of HIV is not based on his having put his penis in the victim's mouth but on his act of exposing the body of the victim to his own bodily fluid, in this case either through ejaculation of semen or emission of preejaculatory fluid containing semen into the victim's mouth, while knowing he was infected with HIV. Neither ejaculation of semen nor emission of preejaculatory fluid is required for defendant's conviction for aggravated criminal sexual assault, but either act is an exposure to a bodily fluid, which is required for defendant's conviction for criminal transmission of HIV. Aggravated criminal sexual assault may be committed without the exposure to any bodily fluid. Criminal transmission of HIV can be committed without the commission of sexual assault. Accordingly, the two convictions are not based upon the same physical act, and both convictions can stand. See *People v. King* (1977), 66 Ill. 2d 551, 566, 363 N.E.2d 838, 844-45.

Defendant's final argument on appeal is that the trial judge's reliance on improper factors in sentencing led him to abuse his discretion in imposing defendant's sentences. We agree. Defendant's presentence investigation report indicates that prior to the instant offenses he had the following criminal history: a 1979 conviction for battery on

a peace officer in California, for which he was placed on probation; convictions in 1990 for two counts of misdemeanor theft also in California, for which he was again placed on probation; and a conviction in 1990 for speeding and driving while license suspended or revoked in California, for which he was sentenced to 15 days in jail. There was an outstanding bench warrant issued June 1, 1989, against defendant in California regarding his failure to appear on charges of operating an unregistered vehicle, driving while license revoked or suspended, and no valid registration. Defendant had no juvenile record.

The presentence investigation report included defendant's assertion that his wife, from whom he was separated, had been a heavy intravenous drug user and that he had contracted HIV from her. Defendant has no children. The report also contains defendant's statement that he had had a girl friend prior to his arrest but he could not remember her name or address. Defendant did not complete high school. Defendant had had his own business in California which serviced fire-protection equipment; however, the business was under investigation for operating with expired licenses and for not completing work in compliance with standards. The business was now closed. After returning to Illinois, defendant had been employed at a body shop, where he was reported to have been a good worker.

Defendant had been convicted of aggravated criminal sexual assault, a Class X felony carrying a possible prison sentence of 6 to 30 years, and criminal transmission of HIV, a Class 2 felony carrying a possible prison sentence of three to seven years. No evidence was introduced in aggravation or mitigation. Arguments were heard.

The trial judge discussed the presentence investigation report, indicating he had reviewed and considered it. The judge then made the following comments which we find demonstrate that he abused his discretion in sentencing defendant as he did:

> "Very next paragraph [of the presentence investigation report], 'Dempsey stated he did have a girlfriend prior to his arrest.' Now that to me is important when you go talking about body fluids. He had a girlfriend prior to his arrest here in Williamson County after he had returned from California. Went to the doctor. Had a test made. He had a girlfriend. And what did the jury say that he did to his little brother, knowing he had HIV virus?
>
> You know, we have a lot of laws with respect to this HIV virus that the legislature makes, and we have those that try to surround information—even if a person takes a test, the doctor or who knows about it, unless it's in the line of duty, he should

not even reveal that he went to take the test or she went to take the test. So it is in a sense, this HIV virus is in a sense a hidden disease. The general trend of the law and all the requirements seems to be that they try to take a person with this HIV virus and hide him in a closet and don't tell the world about it, but let him go on out and get his girlfriend, and she's not allegedly supposed to know about it apparently because—unless he tells her or somebody tells her. It's a hidden disease. What's the public going to do about it? What are these innocent people who don't have HIV going to do about people roaming the streets making dates and fooling around with little boys? What is the world going to do with that sort of a person?
***
You know, what did we do with a mad dog, dog that was alleged to be rabid, mad dog? He would probably be put in a cage, as I understand the way they're handled, for about ten days or two weeks to see if he acts kind of like he's got rabies to see if he really comes through with it. In the meantime, you're sitting there having been bitten, and you don't know what to do. But if he comes through and he has to be done away with because he exhibits a slobbering or whatever the reaction is of a rabid dog, they kill that dog and have his head examined. Then they start giving injections to the little boy, the little girl, man or woman that was bitten by that dog. So what they immediately do is put him in confinement, this dog that's running wild. I'm not saying you're a dog, but I'm saying—I'm thinking of a theory of something occurring where it is so serious they confine the animal or the life that's causing the problem until they make a determination as to whether or not the animal is rabid, and if so, he's—well, it gets worse and they destroy him or he dies of his own disease.

So we've got a problem what we're going to do with you. Even if probation were available, I'd be highly reluctant to turn you loose on the public. ***

But if a little child even got scarlet fever or the measles, the child would probably be confined by quarantine until the child had healed to the extent that the child could again mingle with the public. But with a virus, you can't discriminate. The law protects them. They can't even refuse to hire them. I suppose they can work in a restaurant and serve food to us, work as a cook. If you don't hire them, even though you know they've got the HIV virus, there might be a suit of discrimination.

I suppose there's been too many big wheels in this world who have had this virus. It may be sometimes called a political disease. Be it as it may, it has the publicity of being a very serious ailment, and I'm not a doctor, and I don't know how serious it is, but that's what I hear.

But, oh, now, in this report, this girlfriend you had, you said you couldn't remember her full name, didn't know where she lived. So no one can contact her, I guess, and tell her to make ready for the onslaught of whatever might come, if anything does come from this relationship, maybe all you did was hold hands. I don't know.

But you have a conviction by a jury after a long trial, and I'm trying to obey some of these rules that hide the evidence, hide the evidence, don't reveal to the public about your position. Let everybody be innocent bystanders while you run through the crowd at will, and wherever you find a possibility spread your sperm or body fluids maybe in a way to cause a spread of this horrible disease.

Why, in the olden days we had the leprosy colony, but we don't do that today. We're more modern. We let people with the HIV just run around and don't tell anybody they've got it. Well, maybe that's the way the law ought to be. They say the reason for that is that if you think you've got HIV virus, you won't go be tested because you think everybody will know about it. If you feel that simple about your health, you may just die. \*\*\*

\* \* \*

\*\*\* I hope that people who hear of this will think it's best if they have the HIV virus that they start protecting the public and not be like a mad dog out in the wilds biting anything that comes along or stands still or falls over backwards."

While sentencing judges are vested with wide discretion so that reasoned judgments as to the penalty appropriate to the particular circumstances of each case can be accomplished, that discretion is not unfettered. (*People v. O'Neal* (1988), 125 Ill. 2d 291, 297, 531 N.E.2d 366, 368.) Where the sentencing judge relies on improper factors, including prejudice, speculation, and conjecture, to the exclusion of the requisite statutory factors, the sentence should be vacated and the cause remanded for resentencing. (See *People v. Rosa* (1990), 206 Ill. App. 3d 1074, 1084-85, 565 N.E.2d 221, 228; *People v. Embry* (1989), 179 Ill. App. 3d 1059, 535 N.E.2d 87.) As we stated in *People v. Joe* (1991), 207 Ill. App. 3d 1079, 1085, 566 N.E.2d 801, 807, consideration of an improper factor in aggravation clearly affects the defend-

ant's fundamental right to liberty, and a court of review must remand such a cause for resentencing, except in circumstances where the factor is an insignificant element of the defendant's sentence.

■■■ While a sentencing judge may properly consider nonstatutory aggravating factors in imposing sentence, the evidence considered must be both relevant and reliable. (*Joe*, 207 Ill. App. 3d at 1086, 566 N.E.2d at 807.) In the instant case, it appears to us that the trial judge relied on unfounded fear and prejudice relating to HIV infection and on speculation and conjecture. The sentencing judge speculated that because defendant reportedly had a girl friend prior to his arrest, he likely engaged in activity which could infect her, without any evidence in the record that this was so. The judge compared HIV sufferers with scarlet fever victims, suggesting the need for quarantine. He suggested, with no evidentiary support, that HIV sufferers receive some protection under the law, because of political considerations, that they do not deserve. He made comparisons of HIV sufferers to rabid dogs, mad dogs, and lepers, dwelling on the danger of allowing defendant to "run through the crowd at will": "wherever you find a possibility spread your sperm or body fluids maybe in a way to cause a spread of this horrible disease." There was absolutely no evidence in the record that defendant had had any type of contact with any individual other than the victim which could result in transmission of HIV. Finally, the judge stated that he hoped the sentence imposed would tell HIV sufferers that they should "start protecting the public and not be like a mad dog out in the wilds biting anything that comes along or stands still or falls over backwards."

The sentencing judge was so prejudiced by fear of the disease that he let improper factors influence him and did not consider the requisite statutory factors. Indeed, we are unable to determine whether the judge gave any consideration to the rehabilitative potential of the defendant, as required by our constitution. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 154, 368 N.E.2d 882, 884.) Clearly, these improper factors were significant elements in the defendant's sentences.

We do not believe that this sentencing judge made a reasoned and dispassionate determination as to the appropriate sentences to be imposed on defendant. He clearly abused his discretion in sentencing defendant. Accordingly, we vacate defendant's sentences and remand this cause for resentencing with directions that the cause be assigned to a different judge on remand. See *Joe*, 207 Ill. App. 3d at 1087, 566 N.E.2d at 808.

For the foregoing reasons defendant's convictions for aggravated criminal sexual assault and criminal transmission of HIV are affirmed,

defendant's sentences are vacated, and this cause is remanded for re-sentencing with directions that it be assigned to a different judge on remand.

Affirmed in part; vacated in part and remanded with directions.

CHAPMAN, P.J., and GOLDENHERSH, J., concur.