NOTICE
Decision filed 11/06/23. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2023 IL App (5th) 210320-U

NO. 5-21-0320

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Saline County. |
| | ) | |
| v. | ) | No. 20-CF-349 |
| | ) | |
| NATHANIEL B. HARRIS, | ) | Honorable |
| | ) | Todd D. Lambert, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE BARBERIS delivered the judgment of the court.
Justice McHaney concurred in the judgment.
Justice Vaughan dissented.

**ORDER**

¶ 1   *Held*: We reverse defendant's conviction and remand for a new trial, where the circuit court abused its discretion by finding the minor child competent to testify.

¶ 2   Following a bench trial in the circuit court of Saline County, defendant, Nathaniel B. Harris, was convicted of one count of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2020)), a Class X felony, and sentenced to 15 years in prison in the Illinois Department of Corrections (IDOC), followed by 3 years of mandatory supervised release (MSR). Defendant now appeals his conviction in this direct appeal, raising the following issues: (1) the court abused its discretion by finding the minor child, O.H., competent to testify at trial, (2) he was denied effective assistance of counsel, and (3) the State failed to prove him guilty beyond a

1

reasonable doubt. For the following reasons, we reverse defendant's conviction and remand the cause for a new trial.

¶ 3                                          I. Background

¶ 4       The following factual recitation was taken from the common law record on appeal and the lengthy report of proceedings. We recite only those facts relevant to the issues raised in the instant appeal.

¶ 5       On July 9, 2020, the State charged defendant by information with one count of predatory criminal sexual assault of a child against his daughter, O.H., born December 22, 2016, who was three years old at the time. The information alleged that, "between May 29, 2020, and June 3, 2020," in Saline County, Illinois, defendant, a person 17 years of age or older, knowingly committed an act of sexual penetration with O.H., a child under 13 years of age when the crime was committed, when defendant placed his finger in the vagina of O.H., in violation of section 11-1.40(a)(1) of the Criminal Code of 2012 (*id.*).

¶ 6       A. Pretrial Motions and Hearings

¶ 7       On October 16, 2020, and December 4, 2020, the State filed motions *in limine* requesting that the circuit court allow into evidence certain out-of-court statements made by O.H. to Brandi Hankins, a forensic interviewer at the Guardian Center, Blair Partain, O.H.'s mother, and Theresa Partain, O.H.'s maternal grandmother. The State's motions also requested the court allow O.H. to testify via closed-circuit television (CCTV).

¶ 8       On January 28, 2021, the circuit court held a hearing on the State's motions. At the outset of the hearing, the parties agreed to allow O.H. to testify at defendant's trial. The following testimony was presented.

¶ 9     1. Brandi Hankins

¶ 10     Brandi Hankins, a forensic interviewer at the Guardian Center, testified to the following. Following a hotline call from O.H.'s stepmother, Kelsea Harris, to the Illinois Department of Children and Family Services (DCFS), Hankins interviewed O.H. on June 5, 2020. Harris alleged that Cody Travelstead, Blair's boyfriend at the time, sexually abused O.H.

¶ 11     During the forensic interview, O.H. told Hankins that she "hurt down there." O.H. also "pointed" to her vaginal area and said, "I hurt right here[,] and I bled." Hankins asked O.H. what happened, and O.H. "finally said that daddy did it." Hankins next asked O.H., "daddy did what?" O.H. "took her fingers and demonstrated on the [anatomically correct] doll, her hand, and made an upward motion like this with her fingers" in the vaginal area of the doll. O.H. then told Hankins that her daddy touched her while she was standing up in her bedroom at "mommy's house." Hankins pointed to the doll and asked O.H. if anyone else touched her vaginal area. O.H. initially said yes. Hankins, using the doll again, asked O.H. if anyone else touched her in her vaginal area, and O.H. said no. The circuit court admitted Hankins's forensic interview and accompanying report into evidence. The State then played the CCTV recording of the June 5, 2020, forensic interview.

¶ 12     On cross-examination, Hankins admitted that O.H. stated that defendant touched her at "mommy's house." Despite this, Hankins's forensic report stated that defendant touched O.H. in O.H.'s bedroom at defendant's house. Trial counsel also highlighted that O.H. provided inconsistent responses regarding who lived at Blair's and defendant's homes. Hankins acknowledged that O.H. initially talked about a swing set in relation to her vaginal area hurting; however, Hankins confirmed that O.H. stated that defendant touched her vaginal area. Hankins also acknowledged that O.H. did not exhibit signs of fear when she talked about defendant, and

3

that O.H. liked living with defendant. Hankins explained that, based on her experience, children often do not understand that inappropriate touching equates to alleged abuse. Hankins confirmed that O.H. said, "yup," when Hankins asked her if anyone else touched her vaginal area, although O.H. later said that she touched herself.

¶ 13    On redirect examination, Hankins testified that O.H. touched herself two or three times to demonstrate where defendant touched her. Hankins clarified that O.H. did not state that Cody touched her vaginal area or private parts. Unprompted, O.H. stated that defendant touched her while she stood up in her bedroom. The following discussion took place regarding the location where the alleged abuse took place:

> "THE COURT: *** So when you put in the report that it was dad's [house], as Mr. Hunn [trial counsel] pointed out, that's not exactly what the child said.
> THE WITNESS [HANKINS]: Yes. That's not what the child said.
> THE COURT: Okay.
> THE WITNESS: That was child being—that dad had done it, then the bedroom, and then from team members as we talked about the interview.
> THE COURT: So are you fabricating evidence?
> THE WITNESS: No, sir.
> THE COURT: Right. Because the child said it was at mommy's house, right?
> THE WITNESS: Yes.
> THE COURT: Right. Okay. I don't know what other team members said, but the child said, mommy's house.
> THE WITNESS: Yes."

¶ 14    2. Blair Partain

¶ 15    Next, Blair Partain, O.H.'s mother, testified to the following. Blair testified consistently that she did not talk about defendant and the alleged abuse with O.H. prior to the June 5, 2020, forensic interview. Blair confirmed that O.H. called Cody by his first name, never dad or daddy, and only referred to defendant as daddy. On March 8, 2020, O.H. pointed to her vaginal area, which was red but not bleeding, and said to Blair, "daddy hurt her" when defendant "played with

4

her" with his "fingers and hand." At that time, Blair did not believe that defendant sexually abused O.H. Blair, however, documented O.H.'s complaint in a notebook.

¶ 16    The State proceeded to ask Blair about 11 out-of-court statements that O.H. made, unprompted, to Blair following the June 3, 2020, incident. On June 10, 2020, O.H. stated that defendant "hurt me down below, made me bleed, and it hurt." On June 11, 2020, O.H. "stuck [her toy dog] up really high between her thighs" in the bathtub and said, "[D]addy showed me this and hurt me." On June 12, 2020, O.H. said that she "need[ed] to go get checked out by a doctor. I'm hurting. Daddy hurt me down low." On June 15, 2020, O.H. said that defendant "yelled back, no, bad girl" when O.H. told him to stop. On June 19, 2020, O.H. experienced nightmares. O.H. told Blair that Kelsea saw blood in the tub, and O.H. told Kelsea that "daddy hurt me." On June 21, 2020, O.H. told Blair that "the monsters didn't get me last night." O.H. then said that "daddy was the monster." On June 25, 2020, O.H. said "there's no blood there. That daddy had hurt her" while Blair dried off O.H.'s legs following a bath. On July 1, 2020, O.H. stuck a jump rope handle into her pants and said, "[D]addy showed me this but said not to talk about it." On July 2, 2020, O.H. screamed from her bedroom, "dad, no." Blair found O.H. shaking and scared in her bed. On July 10, 2020, O.H., while watching a TikTok video of a young girl in a hospital bed, stated, "[M]aybe her daddy hurt her down low, too. I was bleeding. Daddy had blood on his fingers, and I was crying,". On July 14, 2020, O.H. said, "it's all my fault what daddy did to me down low."

¶ 17    On cross-examination, Blair confirmed that she engaged in "zero" conversations with O.H. after O.H. made the above statements. Blair admitted that she did not mention the March 8, 2020, incident to police and O.H.'s doctors, and she did not provide the State with a journal entry for this date. On redirect, Blair clarified that she initially "thought [defendant] was just putting diaper rash cream on her" on March 8, 2020.

¶ 18   3. Theresa Partain

¶ 19   Theresa Partain, O.H.'s maternal grandmother, testified to the following. According to Theresa, O.H. identified her bedroom at her daddy's house as "my bedroom at [d]addy's," and referred to her bedroom at her mother's house as "[m]y bedroom."

¶ 20   The State proceeded to ask Theresa about five out-of-court statements that O.H. made to Theresa following the June 3, 2020, incident. On June 12, 2020, O.H. "t[ook] her hand and reached down between her legs and she says, Mawmaw, I'm not bleeding no more down there from my daddy." On June 14, 2020, O.H. "put her hand down [low] *** between her legs," and said to her female cousin, "I've been to the doctor when daddy hurt me down low." On June 22, 2020, O.H. stated that she was "scared of the monster." O.H. stated that the monster was "my daddy and I'm scared of my daddy." On July 6, 2020, O.H. stated, "Mawmaw, my daddy made me bleed down low and Kelsea cleaned me up, and I was freaking out" "at my [d]addy's house *** and Kelsea was *** in the bedroom." Theresa never heard O.H. use the phrase "freaking out" before. On July 11, 2020, O.H. said, "I hate my daddy. I'm scared of my daddy." Theresa testified that she changed the subject when O.H. discussed defendant or the alleged sexual abuse.

¶ 21   On cross-examination, Theresa stated that, prior to June 3, 2020, O.H. told her, "Mawmaw, daddy touches me way down low." Theresa "didn't question" O.H.'s comment but assumed that defendant changed O.H.'s diaper and applied diaper rash cream. Theresa agreed that O.H. never said she hated or feared defendant prior to June 3, 2020. Additionally, Theresa testified that O.H. never said that defendant made her bleed or referred to defendant as a monster prior to June 3, 2020.

¶ 22   Following testimony, the State argued that O.H.'s out-of-court statements were credible. The State asserted that O.H. consistently repeated the incident in detail, including the position and

location of the sexual abuse, and she "never said it was somebody else. She never said it didn't happen. She never recanted." The State argued that O.H. lacked motive to fabricate, given her young age, and that neither Blair nor Theresa coached O.H. to fabricate the allegations against defendant. The circuit court responded that it found Blair's testimony incredible, where Blair testified that she never discussed defendant or the alleged sexual abuse with O.H. following the June 3, 2020, incident.

¶ 23    Trial counsel then requested the circuit court deny the State's motions *in limine* and exclude O.H.'s out-of-court statements. First, trial counsel argued that the State failed to prove when and where the sexual abuse took place. Trial counsel also argued that Hankins's report lacked credibility. Specifically, trial counsel highlighted that O.H. told Hankins that defendant touched her at her mother's house; however, Hankins inadequately reported that defendant touched O.H. at defendant's house. Trial counsel, agreeing with the court, argued that Blair's and Theresa's testimonies were incredible, where they testified that they never discussed defendant or the alleged sexual abuse with O.H. following the June 3, 2020, incident.

¶ 24    Following argument by the parties, the circuit court took the matter under advisement. Over trial counsel's objection, the court scheduled defendant's jury trial for March 2, 2021, in light of defendant's prior speedy-trial demand.

¶ 25    On January 29, 2021, the circuit court entered an order granting the State's motions *in limine*. With regard to O.H.'s out-of-court statements, the court stated: "Assuming the child testifies at trial, or the State otherwise complies with 725 ILCS 5/115-10(b)(2), the aforesaid statements shall be admitted at the trial of this cause." The court determined that O.H.'s statements to Blair and Theresa were consistent. Additionally, the court determined that neither Blair nor Theresa coached O.H. That same day, the State filed a motion to reset defendant's jury trial to

7

February 17, 2021, due to the unavailability of a material witness, Sheriff's Deputy Justin McKinney, on March 2, 2021.

¶ 26 On February 2, 2021, the circuit court heard argument on the State's motion to reset trial. At the hearing, the State requested the court reset defendant's jury trial to February 8, 2021, to comply with defendant's speedy-trial period. Trial counsel objected. In light of defendant's prior speedy-trial demand, the court granted the State's motion and reset defendant's jury trial for February 8, 2021.

¶ 27 On February 4, 2021, defendant filed a motion *in limine* to bar evidence of any and all prior arrests, convictions, and bad acts or crimes of defendant. The same day, the circuit court also held a pretrial hearing on defendant's motion. At the hearing, the court stated on the record that it "would entertain a Motion to Continue and probably grant that if anybody was of interest in that." Both parties desired to move forward with defendant's jury trial. The court granted defendant's motion *in limine* but reserved ruling on the issue of defendant's prior bad acts or crimes.

¶ 28 B. Defendant's Bench Trial

¶ 29 On February 8, 2021, defendant's four-day bench trial commenced. Prior to trial on February 8, 2021, defendant waived his right to a jury trial, which the circuit court accepted. Additionally, with regard to defendant's motion *in limine* concerning defendant's prior bad acts or crimes, the circuit court determined that O.H.'s statements "of other acts against her by [defendant] which have been previously disclosed in this case would be admissible." The State proceeded with opening statements, but trial counsel reserved making an opening statement. The following evidence was adduced at trial.

¶ 30   1. Kelsea Harris

¶ 31   The State called Kelsea Harris, defendant's wife and O.H.'s stepmother, who testified to the following. Kelsea watched O.H. on Wednesday, June 3, 2020, while defendant worked. At approximately 3 p.m., Kelsea noticed feces in O.H.'s underwear. Kelsea cleaned a "smidge" of blood from O.H.'s vaginal area with a wet washcloth when she noticed O.H.'s vaginal area was "very red and it almost looked raw." Sometime between 3 p.m. and 4 p.m., Kelsea called defendant, and the two agreed to bathe O.H. Kelsea took a photo of O.H.'s vaginal area with her cell phone and then bathed O.H. for "about two hours."

¶ 32   While in the bathtub, O.H. told Kelsea that "mommy was scooping white stuff from her down there," referring to O.H.'s vagina. Kelsea asked O.H. about the white stuff, but O.H. "couldn't really give me an answer. She just kept saying umm, umm, you know." When Kelsea asked a second time, O.H. talked about a purple hairbrush at her mother's house. Shortly thereafter, O.H. stood up in the bathtub, pointed to her butt, and said she bled from "down there and from my butt" last night. When Kelsea asked why O.H. bled, O.H. said "mommy had smacked her legs and she smacked her own legs." Kelsea asked O.H. who stayed at her mother's house last night, and O.H. stated, "mommy and Cody." Kelsea asked if her mother or Cody made her bleed and "very softly she said Cody did." The following colloquy took place between the State and Kelsea:

> "Q. Did she say Cody did, or did she just give you the name of Cody?
> A. She said Cody did. And then I asked her how did Cody make you bleed and then she said he touched me. And then I had asked her where he [Cody] touched her at and she took her finger and put it down to her vaginal area and said right there."

¶ 33   Kelsea confirmed that O.H. played in a bubble bathtub when she "took her finger and put it down to her vagina area and said right here." Kelsea further stated that O.H. "might have put her finger in. That's what it looked like from where I was sitting." The State proceeded to asked Kelsea the following: "But [O.H.] never—did she ever tell you Cody touched me?" Kelsea responded,

9

"She never said in a sentence Cody touched me, no." Given the context of the conversation, Kelsea assumed O.H. was referring to Cody because "we were talking about Cody and her mom." O.H. never told Kelsea that she felt pain in her vagina or butt. The following dialogue took place:

> "Q. When you had asked [O.H.] who was with her, who stayed at her house with her mother the night before, what was her response?
> A. She said mommy and Cody.
> Q. Okay. And then what did you say next?
> A. I asked if mommy or Cody had touched her.
> Q. Okay. And then what was her response?
> A. She said Cody did.
> Q. She said Cody did. And that's what you are saying, not just Cody, Cody did?
> A. That is what I recall, yes."

Kelsea could not recall whether O.H. exhibited unusual, sexualized behavior or inappropriate touching from May 29, 2021, to May 31, 2021. However, Kelsea recalled one time in 2020 when O.H. climbed on defendant's lap and attempted to touch defendant's penis. According to Kelsea, defendant "put a stop to it."

¶ 34    On cross-examination, Kelsea testified that defendant's parents dropped off O.H. with Kelsea on June 3, 2020, while defendant worked. During the day, however, O.H. requested to FaceTime defendant. Kelsea, who was nine months pregnant at the time, bathed O.H. in the bathtub for two hours because "she was just having so much fun playing with her toys that I just let her play in the water." The following conversation took place:

> "Q. Okay. And so at some point you had asked [O.H.] what she had done the night—or who she was with the night before?
> A. Yes.
> Q. And she had mentioned that she was with her mom and with her mom's boyfriend, Cody?
> A. Yes.
> Q. Okay. And during the process of talking about mom and Cody[,] you had asked her if anybody had touched her; is that correct?
> A. Yes.
> Q. And [O.H.] used the pronoun he when she said he did it; is that correct?
> A. She said he touched me, yeah.

10

Q. So were you talking about—at that time were you and [O.H.] talking about any other male besides Cody?

A. No.

Q. Okay. So[,] the conversation was centered around [O.H.'s] time with Cody and Ms. [Blair] Partain?

A. Yes."

Kelsea also explained that O.H.'s vagina was "red and raw" on June 3, 2020, which resembled diaper rash.

¶ 35    2. O.H.

¶ 36    Next, the State attempted to call O.H. by way of CCTV; however, the circuit court experienced technical difficulties. The State and trial counsel agreed to "pass this witness for the day."

¶ 37    On February 9, 2021, the second day of defendant's bench trial commenced.

¶ 38    The State first called O.H. to testify. Prior to hearing any testimony, the trial judge held a competency hearing. O.H. initially refused to sit near the trial judge. O.H. held up four fingers when asked her age. O.H. acknowledged that she recently turned four but did not have a birthday party. O.H. shook her head up and down when the trial judge asked her if she attended preschool, and she testified two times that her preschool teacher's name was "My teacher" because she could not remember her teacher's name. The following conversation took place:

"THE COURT: Well, I need to ask you some questions about talking to you here today. Do you know what the truth is? Do you know what that means?

MINOR CHILD: I do.

THE COURT: You do?

MINOR CHILD: Yeah.

THE COURT: Do you know what the truth means? Do you know—what about a lie, do you know what a lie is?

MINOR CHILD: No.

THE COURT: You don't know what a lie is. Do you know if I asked you to only tell me things that actually happened would you agree to do that today?

MINOR CHILD: (Nods head side to side).

THE COURT: You won't. You're shaking your head no. Okay. If I asked you to only tell me things that were actually said[,] would you agree to do that today?

11

MINOR CHILD: (Nods head side to side).

THE COURT: You're shaking your head no again. Okay. Will you talk to me today if I ask you some questions or if these people ask you some questions?

MINOR CHILD: (Nods head side to side)."

The trial judge then asked O.H. if she liked dolls. O.H. handed her doll to the trial judge, and the two briefly discussed O.H.'s favorite color and that O.H. liked unicorns. The trial judge then stated, "So can you tell me your name?" O.H. declined. The trial judge asked O.H. if she could "tell me things that were said or that actually happened." O.H. declined. After a short recess, the trial judge asked O.H. if she could state her name. O.H. refused two times. Again, the trial judge asked O.H. if she would "promise to tell me things that actually happened or that were actually said." O.H. declined and requested her mother.

¶ 39 After a short recess, the circuit court stated, "I think it's safe to say that after multiple attempts that the alleged minor victim is unavailable to testify." The following conversation took place:

"MS. KAISER [(ASSISTANT STATE'S ATTORNEY)]: When Your Honor was out of the room *** Mr. Hunn [trial counsel] and I did question the child about whether she would tell you what she knows and she indicated that she would. Mr. Hunn also asked her a series of questions between differentiating what she knew to be wrong and what she knew to be right. She was able to answer those questions satisfactorily. I'm concerned that when the question was posed to her if she would tell what happened, I don't know that she may understand what that means.

THE COURT: Okay. She wouldn't tell me her name. That's a problem. She was asked multiple times if she would agree to tell me things that actually were said or that actually happened[,] she said no on two or three occasions. I am walking a fine line between prompting and propping up a witness and simply determining whether the witness is competent."

The court determined O.H. incompetent to testify. The court proceeded to state: "We tried yesterday, she wouldn't even sit by me or talk to me, say words to me. And after three attempts this morning she *** wouldn't agree to say words to me about questions that I asked her." The

12

State then requested, without objection by trial counsel, to call O.H. for a competency hearing the next day. The court agreed.

¶ 40    3. Blair Partain

¶ 41    Blair testified to the following. From Friday, May 29, 2020, to Sunday, May 31, 2020, defendant exercised visitation with O.H., while Blair exercised visitation with O.H. from Monday, June 1, 2020, to Tuesday, June 2, 2020. On June 1, 2020, Blair, Theresa, and O.H.'s maternal grandfather saw O.H. On June 2, 2020, Cody, Blair, and O.H. ate dinner at Blair's house from 7 p.m. to 8 p.m. Blair did not leave O.H. with Cody at any point that evening.

¶ 42    On June 3, 2020, defendant texted Blair at 5:03 p.m. from Kelsea's phone. Defendant stated that O.H. "was bleeding from her girl area and said that she needed to go be seen by a doctor." Blair called Kelsea's phone at 5:27 p.m., at which time defendant informed Blair that "we were just getting her out of the bath[,] and they were getting ready to blow dry her hair." Blair felt the situation demanded a more urgent response "[b]ecause [O.H.] never bled from her girl area before." At 5:35 p.m., defendant texted Blair that he believed O.H. had a urinary tract infection (UTI). At 5:36 p.m., defendant texted Blair, "She said it hurts and I looked it up and it could be a UTI." At 5:37 p.m., Blair texted defendant: "Just get her here and I'll get her to the doctor." After defendant's parents dropped off O.H., Blair immediately drove O.H. to Harrisburg Medical Center Emergency Room (ER).

¶ 43    At the ER, O.H. provided a urine sample without issue. Shortly thereafter, O.H. started "crying and twisting" when Blair attempted to lay O.H. down on the exam table to "remove her bottoms." Kathy Schierbaum, a nurse practitioner (NP), examined O.H.'s vaginal area for approximately 30 seconds while Schierbaum, a medical assistant, and Blair held O.H. down. After the exam, Schierbaum provided Blair with the intake number to DCFS. After O.H. calmed down,

13

Blair noticed O.H. "took her hand and just grabbed" "her vaginal area" over her clothes. Blair testified that O.H. "grabbed at herself" 5 or 10 times in the past.

¶ 44 On June 5, 2020, Blair took O.H. to the Guardian Center for a forensic interview. Blair testified that she "told [O.H.] we had to go somewhere," but she did not converse with O.H. about defendant or the alleged sexual abuse prior to the interview.

¶ 45 On June 10, 2020, Dr. Kathy Swafford examined O.H. Prior to the exam, Blair informed Dr. Swafford that O.H. had a UTI, and that defendant told Blair via text on June 3, 2020, that O.H. bled from her vaginal area. While in Dr. Swafford's presence, O.H. starred to cry and became "very clingy, wouldn't let go of me, looking like she was getting scared" when Blair attempted to lay O.H. down on the exam table to remove O.H.'s underwear. O.H. refused to "open up her legs, and she was just crying and screaming that she didn't want to." Dr. Swafford did not perform the exam.

¶ 46 Blair further testified that she never observed Cody, her boyfriend from January 2020 to October 2020, inappropriately touch O.H. Additionally, O.H. never told Blair that Cody touched her. Blair testified consistently with her prior testimony regarding the 11 out-of-court statements that O.H. made to Blair following the June 3, 2020, incident.

¶ 47 On cross-examination, Blair testified that she bathed O.H. on May 31, 2020, when she returned home from defendant's house. Blair confirmed that she washed O.H. head to toe, including washing her genitals. There was no blood or any sign of trauma to O.H.'s genitals. Blair confirmed that defendant saw O.H. on May 29, May 30, May 31, 2020, and the evening of June 3, 2020.

¶ 48 Blair testified that O.H. did not appear scared or upset when Blair picked her up on June 3, 2020. Blair confirmed that she never observed any physical signs of trauma after O.H. saw

14

defendant. On redirect examination, Blair testified consistently with her prior testimony regarding the March 8, 2020, incident.

¶ 49    4. Kathy Schierbaum

¶ 50    Kathy Schierbaum, an experienced family NP, testified to the following. Schierbaum examined O.H. on June 3, 2020, at the ER following complaints of blood and pain in O.H.'s perineal area. Initially, Blair told Schierbaum that O.H. had vaginal bleeding. Schierbaum examined O.H. from head to toe for approximately 30 minutes. Schierbaum stated the following:

> "I didn't see anything externally that was alarming, no abrasions, tears, no bleeding at that time. The mother did tell me that the patient had been bathed prior to bringing her back to mom so that may have cleaned up, you know, anything there. And then we sent a urine sample to the lab."

The results from O.H.'s urine sample showed that O.H. "did not have a significant amount of blood that I would expect to be seen externally." Schierbaum prescribed O.H. antibiotics for a UTI, due to elevated white blood cells and bacteria in O.H.'s urine. Following the exam, Schierbaum contacted DCFS and the Guardian Center "[b]ecause of the concern of the story." Schierbaum believed "there needed to be more work-up than what we could perform in the emergency room."

¶ 51    On cross-examination, Schierbaum confirmed that she did not find any issues when she examined O.H. on June 3, 2020. Although Schierbaum did not observe blood, lesions, rashes, or scrapes near or around O.H.'s genital areas, she could not rule out an internal injury. Schierbaum confirmed that she called DCFS because Blair reported that O.H. had blood in her vaginal area. Schierbaum also confirmed that the triage nurse noted that O.H. complained of "non-specific pain" in her pelvic area.

¶ 52    5. Dr. Kathy Swafford

¶ 53    Dr. Kathy Swafford, a board-certified pediatrician, testified to the following. Dr. Swafford, an expert in child abuse pediatrics, estimated that she worked with 1200 children for sexual abuse

related incidents. Dr. Swafford confirmed there were "no significant findings as far as genital trauma" at O.H.'s ER visit on June 3, 2020. Because O.H. had white blood cells in her urine sample, Schierbaum "felt [O.H.] probably had a [UTI] and was treated for that," although there were no red blood cells of significance at that time. Dr. Swafford confirmed that O.H. had blood in her genital area on an "isolated incident just occurring on the 3rd."

¶ 54    On June 10, 2020, Dr. Swafford performed a head-to-toe examination of O.H. and also prepared a report with her findings. She attempted, without success, to examine O.H.'s vagina while O.H. sat on Blair's lap. Dr. Swafford noted that "[a]s soon as we tried to remove clothing from the private area[, O.H.] became very combative." Dr. Swafford did not schedule a follow-up appointment because she "did not expect to see any external findings," given that the June 3, 2020, ER exam did not show abnormal findings. According to Dr. Swafford, children under six or seven "usually" allow her to conduct a physical examination of their genital areas. Dr. Swafford testified to the following:

> "Well, I didn't feel that there was any trauma that day, other than the fact that she was unable to relax enough to let us look at the private area. It certainly is concerning that some trauma occurred. I can't say whether it was an exam at the emergency room or a traumatic event that potentially could have been the cause for the blood that was reported, only that there had been some traumatic event that apparently made her uncomfortable with allowing us to look at her private area."

Because O.H. had blood in her vaginal area and "a UTI can't cause that bleeding from the vaginal area," Dr. Swafford determined that sexual abuse "trauma is still probably on the top of our list[,] even though we did not get the opportunity to document that very well" in O.H.'s case. Dr. Swafford also found it concerning for a three-year-old to stick her fingers up her vagina, which usually manifested itself when a child witnessed sexual acts or was the victim of sexual abuse.

¶ 55    Next, over trial counsel's objection, the State introduced, and the circuit court admitted into evidence, an external photo of O.H.'s prepubertal genital tract. Dr. Swafford believed the

16

photo demonstrated three streaks of dried blood, not a skin injury or laceration, on O.H.'s inner labia and posterior fourchette. Dr. Swafford did not believe O.H.'s June 3, 2020, urine sample contained blood. The following colloque took place:

> "Q. [(ASSISTANT STATE'S ATTORNEY)]: Doctor, did you reach an opinion, based upon a reasonable degree of medical certainty, as to whether the child's presenting problems were consistent with sexual abuse?
> A. I felt that based on the forensic interview information that was shared with me, the historical information, and then the concerns about the behavior and her avoidance of a genital exam combined together made me feel that she was likely a victim of sexual abuse.
> Q. Now, in this case you indicated in your medical report that there were non-specific findings of sexual abuse; is that correct?
> A. Yeah. The only finding that we could make was the history that reported the blood in the genital tract.
> Q. And in your experience with examining these children is there a medical reason as to why you don't find physical findings of sexual abuse?
> A. Yes. The literature is very strong about how infrequent it is that we have an actual finding. The immediate exam, if it's done immediately after the abuse occurred, has a fairly high likelihood of having a finding in a prepubertal child. But once we get beyond 48 to 72 hours, because the mucosal surface of the genital tract heals so rapidly, we rarely have a finding. More recent data is 2.2 percent of the time in a delay of more than 72 hours will we actually have a finding on these exams. So[,] it's extremely low for us to have a finding."

Based on the above information, Dr. Swafford testified that it was common to have non-specific physical findings of sexual abuse, similar to the non-specific findings in O.H.'s case. Dr. Swafford opined that a child does "not typically" experience trauma from self-infliction, noting that a child would not touch themselves "to the point where they would bleed or cause themselves pain."

¶ 56    On cross-examination, Dr. Swafford confirmed that after she considered O.H.'s June 3, 2020, ER medical report, Blair's self-reporting, and Hankins's June 5, 2020, forensic interview, she believed O.H. was sexually abused. Dr. Swafford acknowledged that an inaccurate or incomplete medical history or report could potentially skew her final results. Dr. Swafford confirmed that neither she nor Schierbaum observed physical trauma to O.H.'s vaginal area. The following conversation took place:

17

"Q. [(TRIAL COUNSEL)]: Okay. So[,] let me ask you this question, you had stated that any injury in the genital area usually heals up fairly quickly; is that correct?

A. Yes.

Q. Okay. So[,] if something had happened to the child on Sunday afternoon would there still be evidence of that on Wednesday afternoon?

A. It depends on how significant the trauma was, but in most circumstances most likely not. But if something had happened on Sunday afternoon that was significant enough to cause bleeding it should have continued to bleed if we're going to assume that trauma on Sunday was the reason for the blood on Wednesday.

Q. *** [J]ust so I'm getting it straight. So[,] if there was any physical trauma on a Sunday it should have been noticeable on Sunday night, Monday, Tuesday, and Wednesday?

A. That would be my expectation if we're using blood as our evidence of trauma.

* * *

Q. But if there was blood prior or if there was an injury prior to Monday, a very low chance that blood would still be showing up on Wednesday?

A. Correct.

* * *

Q. And so again it's very rare from fondling *** to cause a urinary tract infection?

A. Correct."

Dr. Swafford confirmed that no evidence existed that O.H. suffered a hymenal injury, "which is what [doctors] typically look[ ] for to make a diagnosis of trauma." Dr. Swafford testified that "maybe 1 percent or less [of children] are not okay" with a genital exam. Moreover, Dr. Swafford stated, "I've probably had maybe ten [children] in 12 years that we weren't able to examine. I mean, it's very rare." Dr. Swafford admitted that O.H. could have experienced some trauma when Schierbaum, her medical assistant, and Blair held O.H. down at the ER on June 3, 2020.

¶ 57   On February 10, 2021, the circuit court held the third day of defendant's bench trial.

¶ 58   6. O.H.

¶ 59   The State again called O.H. to testify, and the trial judge held a competency hearing. The trial judge initially asked O.H. about sticker books with pictures of cats and dogs. The trial judge and O.H. then proceeded to briefly talk about cats and dogs. When questioned, O.H. told the trial judge her first name but did not recall her last name. O.H. confirmed she was four years old.

¶ 60   The following conversation took place:

18

"THE COURT: Okay. Now, today we're going to talk about some things, but before we get started[,] I need to make sure that you know that I only want you to tell the truth today. And the truth is something that was said or something that happened[,] and a lie is something that didn't happen or wasn't said. Do you understand?

MINOR CHILD: (Nods head up and down).

THE COURT: You're shaking your head yes. And you promise that you'll just tell the truth?

MINOR CHILD: Yeah.

THE COURT: Really. All right. Good deal. All right. You may inquire."

The State proceeded with direct examination of O.H. O.H. identified defendant in a picture as her daddy. O.H. also pointed to her vaginal area when the State asked her if she "ha[d] a place on your body that you call 'down there?' " The following conversation took place:

"Q. Now, [O.H.], have you ever bled down there?
A. No.
Q. You haven't? I'm sorry, yes or no?
A. Yes.
Q. Yes. Why did you bleed down there?
A. Because daddy hurt me.
Q. And how did daddy hurt you?
A. With him [*sic*] hands.
Q. With his hands?
A. Yeah.
Q. What did he do with his hands?
A. He hurt me.
Q. He hurt you. What—can you tell me more about what he was doing with his hands when he hurt you?
A. I don't know.
Q. Okay. Where were you when you say that daddy hurt you with his hands? Were you in a kitchen? Were you in a bathroom, a bedroom or somewhere else?
A. I was in my bedroom.
Q. Okay. In your bedroom. Were you at mommy's house or daddy's house?
A. Daddy's house.
Q. Okay. And when you say that he hurt you with his hands *** did you have clothes on like you have on now, or did you have on no clothes?
A. No clothes.

* * *

Q. Has anybody else in this world hurt you—
A. No.
Q. —down there? Now, when he hurt you[,] did he say anything to you[,] or did you say anything to him?
A. I didn't say anything to nobody.

19

Q. Okay. Now, when *** you say he hurt you, can you tell me anymore about what he was doing with hands?
A. (Inaudible mumbling).
Q. I'm sorry?
A. Huh?
Q. What did you say?
A. Him [*sic*] just hurt me.
Q. Now, did *** he hurt you one time or more than one time?
A. More than one time.
Q. When you—do you have your own room at daddy's house?
A. Yeah."

¶ 61    On cross-examination, O.H. testified that defendant spanked her "because I did something bad." O.H. stated that defendant did not bathe her or brush her hair. The following conversation took place:

"Q. Did your mom tell you what you were supposed to say today?
MS. KAISER [(ASSISTANT STATE'S ATTORNEY)]: Objection, hearsay.
THE COURT: Overruled.
Q. [O.H.]?
A. Yeah.
Q. Your mom told you what to say today?
A. Yeah.
Q. Yeah.
                          * * *
Q. Okay. Does your mommy tell you what to say about daddy?
A. Yeah."

On redirect examination, the State attempted to clarify that Blair and O.H. did not talk about defendant the night before, stating: "[W]hen you talked to [mom] last night were you only talking about that you needed to talk to the man in the black dress?" O.H. responded, "Yeah, but I'm really tired."

¶ 62    7. Brandi Hankins

¶ 63    Brandi testified to the following. Brandi admitted that she conducted only three or four interviews with three-year-old children, although trained in neutral fact-finding, child-led conversation. On June 5, 2020, Hankins conducted a forensic interview of O.H. Before the

20

interview, Hankins learned from a DCFS report that Cody allegedly sexually abused O.H. According to Hankins, O.H. "presented very well as far as verbally, she was talking." Hankins testified consistently on direct examination with her prior testimony regarding the June 5, 2020, interview.

¶ 64    On cross-examination, Hankins admitted that she was least experienced in interviewing three-year-old children. Hankins admitted that her forensic report inaccurately stated that defendant touched O.H. at defendant's house. The following conversation took place:

"Q. You said [O.H.] made disclosures of sexual abuse by daddy. Now, what she actually did was made a hand motion, correct?
A. Yes, sir.
Q. Now, you previously in your testimony said she made this motion (indicating)?
A. That's what she did.
Q. With three individual fingers?
A. That's what she did with her fingers going up, yes, sir.
Q. Well, see, now you're holding up four.
A. Three, yes. Three.
Q. Now, in the video it appears [O.H. is] using her entire hand?
A. Her hand was up, but there was [*sic*] three fingers that made the motion of upwards.
Q. Now, the motion she made could also be considered a wiping motion, would you agree?
A. I guess it could be.
Q. Okay. *** Have you ever wiped a child after a bowel movement, went number one, anything else?
A. Yes, sir.
Q. Okay. And it's a motion of moving your hand back and forth?
A. Yes, sir.
Q. Palm up?
A. Palm up, yes.
Q. Okay. The same way that [O.H.] was holding her hand?
A. Open palm up, yes.
Q. Okay. So[,] based on a hand motion you concluded that was sexual abuse?
A. That was what the report came in as is it was indicated as sexual abuse. So according to the DCFS report that is what the alleged incident was. So, yes, we always say on the report what the incident was reported as.
* * *
Q. Now, further in your report you say, [O.H.] stated that dad touched her vagina with his hand. She didn't actually state that either?
A. She didn't say vagina, but it was the vagina area.

21

Q. But she didn't state that?
A. Her word was not vagina, but yes.
Q. So you added that?
A. Yes, so that people reading would know that she was pointing to her vaginal region. Yes. Yes, sir.
Q. But there was a video of that?
A. Yes, sir.
Q. So we could actually see those things?
A. Yes, sir.
Q. So when you wrote them incorrectly there it wasn't necessary, correct?
MR. WISE [(ASSISTANT STATE'S ATTORNEY)]: Objection.
THE COURT: Overruled.
Q. It was unnecessary to make an incorrect statement of fact, yes or no?
A. Yes."

¶ 65    Hankins admitted that she asked O.H. later in the interview if defendant touched her, and O.H. said no. Trial counsel highlighted that Hankins "open[ed] the sentence with when daddy touched you or some variation at a minimum of 14 times." In response, Hankins stated that she was trained to "focus on what the child has said and do a child-led interview." Based on her training, Hankins tried to redirect O.H. to "get her to answer the questions about her statement saying daddy touched me." Hankins agreed that O.H. initially told her that she hurt herself on a swing set. Hankins also admitted that she pointed to the vaginal area of the doll when she interviewed O.H., which could have influenced O.H.

¶ 66    On redirect examination, Hankins testified that O.H.'s hand motion in the forensic interview showed her hand, palm up, moving vertically up and down with three fingers. Hankins confirmed that O.H. disclosed to Hankins that defendant touched her, and that defendant made her bleed.

¶ 67    8. Justin McKinney

¶ 68    Sherriff's Deputy Justin McKinney of the Saline County Sheriff's Office testified to the following. McKinney interviewed defendant and Kelsea separately on June 4, 2020. According to

22

McKinney, defendant appeared calm. McKinney testified that Kelsea told him that O.H. said "he touched me" to Kelsea on June 3, 2020. According to McKinney, Kelsea specifically told him that O.H. did not put the words "Cody and he touched me together." Rather, Kelsea assumed O.H. meant Cody when O.H. used the pronoun he.

¶ 69    Next, McKinney testified that he observed and listened to Hankins's June 5, 2020, forensic interview. During the interview, O.H. "place[d] her fingers inside of her own vaginal area by raising up her dress or skirt that she had on" when O.H. was questioned how defendant touched her. At that point, Hankins "instructed [O.H.] to use the doll that she had in her hands *** [and] from what I observed it appeared that she had placed her fingers inside of what would have been the doll's vaginal area."

¶ 70    On June 17, 2020, McKinney and Deputy Shannon Deuel conducted a recorded interview of defendant (People's Exhibit 15). During the interview, defendant stated numerous times that O.H. was a truthful child. Defendant also indicated his belief that O.H. experienced sexual abuse, based on O.H.'s ability to explain what happened to her by placing her fingers inside of her vagina. The following conversation took place:

> "Q. [(ASSISTANT STATE'S ATTORNEY)]: Did you at any point in time in your interview advise Mr. Harris that [O.H.] had identified her daddy as the one who had touched her down there during the forensic interview?
> A. Yes, ma'am.
> Q. After you advised Mr. Harris of that[,] what did he state, if anything, after that point in time as to whether he believed if his child would lie?
> A. There were several times where he stated again that his daughter would not lie and that he would believe her."

Defendant also informed McKinney that he never changed O.H.'s diapers or panties, although defendant texted the following to Blair on June 3, 2020: "When I get her[,] I change her into panties and take the ones you [Blair] put on her off and that have had [a] brown stain in the middle." On

cross-examination, McKinney agreed that defendant never admitted to inappropriately touching O.H.

¶ 71    On February 11, 2021, the circuit court held the final day of defendant's bench trial.

¶ 72    9. Cody Travelstead

¶ 73    Cody Travelstead testified to the following. Cody testified that he slept at Blair's house "on the weekends." Cody left Blair's house on Sunday, May 31, 2020, before O.H. arrived home from defendant's house. Cody did not see Blair or O.H. on Monday, June 2, 2020. On Tuesday, June 3, 2020, Cody ate dinner with Blair and O.H. from 7 p.m. to 8 p.m. at Blair's house. Cody did not have alone time with O.H. at that time or in the past. Additionally, Cody denied that he changed O.H.'s clothes, bathed her, helped O.H. use the bathroom, or touched her inappropriately. Cody admitted that he saw O.H. scratch her vaginal area over her clothes and say that "she itched and stuff like that." Cody found this behavior strange. On cross-examination, Cody clarified that O.H.'s motion over her clothing was "kind of violent scratching" that "appeared very odd for [her] age."

¶ 74    10. Theresa Partain

¶ 75    Theresa testified to the following. Theresa testified consistently with her prior testimony regarding three out-of-court statements made by O.H. following the June 3, 2020, incident. On cross-examination, trial counsel highlighted two prior inconsistent statements. First, Theresa originally testified on January 28, 2021, that O.H. said she was "scared of the monster" on June 22, 2020, and then said, "it's my daddy and I'm scared of my daddy" when Theresa asked O.H. what the monster looked like. Theresa acknowledged that her prior testimony was inconsistent with her current testimony on direct examination. Theresa confirmed that O.H. did not say "my daddy is a monster" on June 22, 2020. With regard to July 11, 2020, Theresa originally testified

24

on January 28, 2021, that O.H. said, "I hate my daddy. I'm scared of my daddy." Theresa acknowledged that her prior testimony was inconsistent with her testimony on direct examination, where she testified that O.H. stated, "Maw Maw, my daddy is a monster and I'm really scared of my daddy." The State rested its case.

¶ 76     Trial counsel moved for a directed verdict. Trial counsel argued that the State alleged defendant "placed his finger inside the vagina of [O.H.]" between May 29, 2020, and June 3, 2020; however, no evidence demonstrated that defendant had contact of any nature with the genitals of O.H. between May 29, 2020, and June 3, 2020. Trial counsel argued that the testimonies of Blair and Theresa lacked credibility, given that they both "repeatedly g[ave] varying versions of testimony." Additionally, trial counsel argued that Hankins admitted that her forensic interview report was poorly written and included factual inaccuracies. Moreover, trial counsel argued that Dr. Swafford, although a credible witness, relied on Hankins's inaccurate report, Blair's self-reporting that skewed the forensic interview, and the fact that O.H. refused a physical exam, even though Dr. Swafford testified that O.H.'s combative behavior "very well could have been the result of ER trauma from the time she was examined."

¶ 77     The State argued that it was "not just talking about June 3, 2020, we're not just talking about May 29, May 30, or May 31, 2020." "We are talking about the period of time that this defendant was alone with this child and had access to penetrating her sexually." The State also highlighted that O.H.'s forensic interview showed that the abuse "happened more than one time, more than one occasion." The State requested the circuit court deny trial counsel's oral motion.

¶ 78     In response, trial counsel argued that the State's charging instrument inaccurately referenced the time period of the alleged sexual abuse. Trial counsel stated the following:

> "Somebody signed a legal pleading that said it happened between May 29 and June 3. So that's exactly the period that we're talking about here ***. *** [T]hat means that the

25

defendant had to have caused physical trauma to the vagina of a three year old on a Sunday night, and mom, who bathes her every single day never saw blood, never noticed redness, never noticed anything, all of a sudden she starts bleeding in the care of his now wife at the end of the day on June 3 from the physical trauma that at best happened on May 31st. It's an impossibility. It couldn't happen that way, the doctors did testify to that, that you wouldn't show up three and a half days later bleeding from something that occurred three days prior. That's not how anatomy works."

The circuit court denied trial counsel's motion, stating: "I agree with the State that in the light most favorable to the non-moving party that there is sufficient evidence that a rationale [*sic*] trier of fact would, in fact, sustain a guilty verdict \*\*\*." Trial counsel proceeded with defendant's case-in-chief.

¶ 79    11. Kelly Phelps

¶ 80    Kelly Phelps, an experienced physician assistant, testified to the following on defendant's behalf. Phelps, O.H.'s primary care provider since birth, knew O.H. and Blair very well. Phelps performed an external genitalia exam on O.H. without issue on June 15, 2020. Phelps did not find evidence of trauma or a source of blood. According to Phelps, O.H.'s ER diagnosis was incorrect, because the urine culture showed O.H. "did not have a true infection" and "blood in the urine was negative and nitrate was negative, which I expect to see with a true UTI." Phelps testified that a UTI would not cause blood in the vaginal area.

¶ 81    On cross-examination, Phelps acknowledged that Blair provided her with information prior to the June 15, 2020, visit, including that O.H. had a UTI and that defendant told Blair via text that O.H. had vaginal bleeding. Phelps did not see any signs of trauma, including inflamed, healing, or scarred skin.

¶ 82    12. Kelsea Harris

¶ 83    Kelsea testified consistently with her prior testimony regarding the June 3, 2020, incident.

Kelsea confirmed that Cody was the only male that O.H. referred to in the bathtub when O.H. said, "he touched me." On cross-examination, Kelsea admitted that she told Sherriff's Deputy McKinney and Deputy Deuel on June 4, 2020, that she "just assumed that when [O.H.] used the pronoun he that he referred to Cody." Next, on redirect examination, Kelsea confirmed that Cody was the only male that O.H. referred to in the bathtub. Following Kelsea's testimony, the defense rested.

¶ 84    Following closing arguments, the circuit court found defendant guilty of one count of predatory criminal sexual assault and set defendant's sentencing hearing.

¶ 85    On June 26, 2021, defendant filed a motion for new trial. Relevant to this appeal, defendant argued the following: (1) the State failed to prove him guilty beyond a reasonable doubt, (2) the circuit court erred by denying defendant's motion *in limine* to exclude defendant's prior bad acts or crimes, (3) the court erred by allowing the State to call O.H. to testify three separate times until she "either learned the proper responses or was sufficiently coached" to answer, (4) the court failed to properly determine that O.H. understood the need to testify truthfully on the third instance and erred in allowing O.H. to testify, and (5) defendant suffered ineffective assistance of counsel, where counsel failed to file a motion for a bill of particulars and "restrict" five discovery answers filed by the State. The State filed a motion to dismiss the same day.

¶ 86    On August 17, 2021, the circuit court held a hearing on defendant's motion for new trial and the State's motion to dismiss. Following argument by the parties, the court took the matter under advisement. Two days later, the court granted the State's motion to dismiss in part. Specifically, the court ruled that defendant's arguments concerning ineffective assistance of counsel "survived." The court set a hearing for September 21, 2021.

27

¶ 87    On September 21, 2021, the circuit court held a hearing on paragraphs 9 to 13 of defendant's motion for new trial. Following argument by the parties, the court stated on the record:

> "Well, the Court's heard the arguments. You know, the backdrop to a lot of this—of these claims by the defendant, it does have to do with trial strategy because as my—if my memory serves defendant was insisting on a speedy trial. If the defendant had been given discovery days before the trial and had requested a continuance[,] I would have granted it, but defendant was pressing the State to go to trial in hopes I think that the State couldn't produce their evidence. The defendant was holding the State's feet to the fire to try him within the applicable speedy trial period. And so many of the complaints that the defendant now has do fall under the category of trial strategy because the overall trial strategy was to hold the feet of the State to the fire and make the State try him within the speedy trial period if the State could do it.
>       So[,] requesting a continuance because they've gotten some discovery was not in line with the trial strategy. Trying to get an expert to counter Brandy Hankins was not in line with that trial strategy. Requiring a Bill of Particulars also would have been part of the trial strategy.
>                                           * * *
>       In respects to the Bill of Particulars, you know, I don't know that I've ever seen a case, and certainly none has been cited to this Court today, to stand for the proposition that it is ineffective assistance of counsel for defense counsel not to request a Bill of Particulars. The State is not required to give a specific time of the offense. *** And I agree with the State that the defendant called witnesses that had to do with the issue of the time of the offense. So[,] in any event that is not ineffective assistance of counsel.
>                                           * * *
>       So[,] I think the trial counsel was competent by any standard. As I said, many of the complaints of the defendant were either matters of trial strategy or were not acts of incompetency which resulted in prejudice to the defendant. I agree with the State that defense counsel's performance is not even close to rising to the level of ineffectiveness required by and defined by *Strickland v. Washington*. I thought the defense counsel put on a strong defense. They raised all the important issues."

The court denied defendant's motion for new trial.

¶ 88    That same day, the circuit court held defendant's sentencing hearing. After considering the presentence investigation report, factors in aggravation and mitigation, including defendant's lack of a criminal history, all evidence and arguments presented before the court, defendant's statement of allocution, and Blair's victim impact statement, the court sentenced defendant to 15 years in prison, with 3 years' MSR. Defendant filed a timely notice of appeal.

28

¶ 89                                    II. Analysis

¶ 90    We first turn to defendant's contention that the circuit court abused its discretion by finding

O.H. competent to testify at trial. In that respect, we note that trial counsel raised the issue in

defendant's motion for new trial; however, defendant made no objection at trial to O.H.'s

competency. As such, we find defendant forfeited this issue for purposes of appeal by failing to

properly preserve the error for review. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (to preserve

an alleged error for review, a defendant must raise a timely objection at trial and raise the error in

a written posttrial motion). However, forfeiture is a limitation on the parties and not the reviewing

court, and we may overlook forfeiture where necessary to obtain a just result or maintain a sound

body of precedent. *People ex rel. Department of Human Rights v. Oakridge Healthcare Center,*

*LLC*, 2020 IL 124753, ¶ 36 ("Forfeiture is an admonition to the parties, not a limitation on a

reviewing court's jurisdiction."). Given the circumstances before this court, we will address the

issue of O.H.'s competency on the merits.

¶ 91    The Illinois witness competency statute states that every person, regardless of age, is

presumed competent to testify. 725 ILCS 5/115-14(a) (West 2020). A witness may be disqualified

if the moving party can demonstrate that the witness is either incapable of expressing himself or

is "[i]ncapable of understanding the duty of a witness to tell the truth." *Id.* § 115-14(b)(2). There

is no rigid formula for establishing the competency of a witness to testify. *People v. Puhl*, 211 Ill.

App. 3d 457, 466 (1991). "It is the degree of a child's intelligence, rather than mere chronological

age, that determines a child's competence, and '[i]f the witness was sufficiently mature to receive

correct impressions by her senses, to recollect and narrate intelligently, and to appreciate the moral

duty to tell the truth, she was competent.' " *People v. Garcia*, 97 Ill. 2d 58, 75 (1983) (quoting

*People v. Davis*, 10 Ill. 2d 430, 436 (1957)). "In reviewing competency determinations, reviewing

29

courts consider the length and depth of the preliminary examination and scrutinize the testimony of the witness at trial ***." *In re E.S.*, 145 Ill. App. 3d 906, 908 (1986) (citing *People v. Seel*, 68 Ill. App. 3d 996, 1004 (1979)). The question of a minor witness's competency is for the circuit court, and its competency ruling will not be disturbed absent an abuse of discretion or a misapprehension of some legal principle. *Id.*

¶ 92    Applying these principles to the instant case, we cannot conclude that the trial judge properly found O.H. competent to testify at trial. The record demonstrates that the circuit court attempted to determine O.H.'s competency to testify at trial on three separate occasions over the course of three days.

¶ 93    First, on February 8, 2021, the court attempted to hold a competency hearing of O.H. O.H., however, refused to sit by, or talk to, the trial judge. Next, on February 9, 2021, the circuit court held a competency hearing of O.H. O.H. initially complied and sat near the trial judge. When the trial judge asked her age, O.H. held up four fingers. O.H. responded that she attended preschool, but she could not recall her preschool teacher's name, referring to her teacher as, "My teacher." While she expressed an understanding as to what it meant to tell the truth, she did not understand the meaning of a lie. The trial judge asked O.H. two times if she would agree to "only tell me things that actually happened." O.H. nodded her head side to side, indicating no. The trial judge also asked O.H. two times if she would agree to "only tell me things that were actually sai[d]." O.H. nodded her head side to side, indicating no. O.H. then refused to tell the trial judge her name. The court took a short recess. After the conclusion of the recess, the trial judge asked O.H. if she could state her name. O.H. refused two times. Again, the trial judge asked O.H. if she would "promise to tell me things that actually happened or that were actually said." O.H. declined and requested her mother. The court took another short recess. After the conclusion of the recess, the

30

court stated, "I think it's safe to say that after multiple attempts that the alleged minor victim is unavailable to testify." The court determined O.H. incompetent to testify.

¶ 94    On February 10, 2021, the circuit court again held a competency hearing of O.H. After the trial judge and O.H. briefly discussed cats and dogs, O.H. stated her first name, but she did not know her last name. O.H. confirmed that she was four years old. The court then stated the following to O.H.: "I need to make sure that you know that I only want you to tell the truth today." The trial judge proceeded to state that "the truth is something that was said or something that happened[,] and a lie is something that didn't happen or wasn't said. Do you understand?" O.H. nodded her head up and down, indicating yes. O.H. then responded, "Yeah," when asked if she promised to tell the truth. The court determined O.H. competent to testify.

¶ 95    Based on the foregoing, we conclude that the circuit court abused its discretion by finding O.H. competent to testify. We are troubled by the court's decision to conduct multiple competency hearings of four-year-old O.H. We are especially troubled provided that the court conducted a detailed competency hearing on February 9, 2021, at which time the trial judge determined O.H. incompetent to testify. In reaching its decision, the court properly reasoned that O.H. refused to state her name and "to agree to tell [the trial judge] things that actually were said or that actually happened *** on two or three occasions." The court even went as far to say: "I am walking a fine line between prompting and propping up a witness and simply determining whether the witness is competent."

¶ 96    Despite this, the court conducted a third competency hearing of O.H. the following day. Even though the court determined O.H. incompetent to testify the previous day, the only questions that the trial judge asked O.H. on February 10, 2021, referred to O.H.'s understanding of telling the truth or a lie. While O.H. expressed an understanding as to what it meant to tell the truth on

31

February 9, 2021, she did not understand the meaning of a lie at that time, which was less than 24 hours prior. When considering the length and depth of the court's February 9, 2021, competency hearing in comparison to the limited and very brief competency hearing held on February 10, 2021, the record does not support a finding that O.H. fully understood what it meant to tell the truth and to lie, especially where the trial judge failed to provide follow-up questions with examples to confirm that O.H. possessed the capacity to understand such a question. Accordingly, we conclude that the court abused its discretion in finding O.H. competent to testify.

¶ 97   For these reasons, we reverse defendant's conviction for predatory criminal sexual assault of a child and remand for a new trial. Given our disposition, we need not address defendant's remaining claims. We note that we considered all of the evidence presented at trial with regard to the defendant's conviction that we are reversing and find it sufficient to support that conviction; accordingly, double jeopardy does not prevent the retrial of the defendant. See, *e.g.*, *People v. Jamison*, 2014 IL App (5th) 130150, ¶ 18 (if evidence was sufficient to convict the defendant, principles of double jeopardy do not preclude retrial).

¶ 98                               III. Conclusion

¶ 99   For the reasons stated, we reverse the judgment of the circuit court of Saline County and remand this cause for a new trial.

¶ 100   Reversed and remanded.

¶ 101   JUSTICE VAUGHAN, dissenting:

¶ 102   I respectfully disagree with my colleagues' finding that the trial court abused its discretion when it found O.H. competent to testify. The decision of the trial court regarding a witness's competency "will not be reversed absent an abuse of discretion or a misapprehension of the law." *In re E.S.*, 145 Ill. App. 3d 906, 908 (1986). "[T]he cold black and white of the record is a poor

substitute for the personal observation of the factfinder in determining competency." *People v. Dempsey*, 242 Ill. App. 3d 568, 583 (1993). "The demeanor of the witness, while apparent to the trial court, is hidden from a court of review." *Id.* at 584.

¶ 103   Child witnesses pose a particular difficulty in competency determinations. As stated in *People v. Ridgeway*, 194 Ill. App. 3d 881, 885 (1990):

> "Children are necessary witnesses in most cases involving sexual abuse of youngsters. Such wrongful conduct takes place in secrecy and the evidence, other than the child's complaints, is often limited. The child witness is placed in front of strange faces, and required to relate unpleasant encounters. The court appearance itself is a traumatic experience. *** We are fully aware of the value of the actual observation of the child in the courtroom in making competency decisions of this kind."

¶ 104   In this case, the presiding judge had the opportunity to observe the demeanor of O.H. over the course of two days. When the judge questioned her on the first day, O.H. confirmed her name and indicated she was four years old by holding up four fingers. O.H. also affirmed that she attended preschool. Importantly, when the judge asked O.H. if she knew what the truth was, she stated, "I do." O.H. was able to engage in an age-appropriate discussion about, *inter alia*, her dolls, favorite color, and pet cat, Gracie. Unfortunately, she then wanted nothing further to do with questioning, refused to continue engaging with the judge, and asked for her mother.

¶ 105   The second day, O.H. again stated her first name and affirmed her age. After the judge defined "truth" and "lie," O.H. indicated she understood and when asked if she promised she would just tell the truth, she stated, "Yeah." Thereafter, the State called O.H. to testify.

¶ 106   O.H. testified in an age-appropriate manner. She stated that she lived in Eldorado with her mother and her mother's name was Blair. O.H. was able to indicate where her nose, ears, and toes

were. She also indicated her vaginal area as the place on her body that she called "down there." She identified her father, the defendant, for the trial court, and stated that he was the only person she called "daddy." O.H. also knew her stepmother Kelsea lived with the defendant and that they were going to have a new baby. She admitted that the defendant had spanked her before "because I did something bad." O.H. was able to tell the trial court how daddy hurt her "[w]ith him [*sic*] hands" when she did not have on clothes and that he hurt her "more than once." This testimony was corroborated by other witness testimony.

¶ 107   As the majority pointed out, O.H. answered some questions inappropriately. However, "it is not necessary for the child to give perfect answers to questions asked during the competency determination or at trial to be deemed a competent witness." *Dempsey*, 242 Ill. App. 3d at 584. An imperfect response to a question will "not invalidate a finding of competency in light of what is indicated by the totality of the responses." *Id*. In this case, I believe the totality of the record shows O.H. was able to express herself and understood the duty to testify truthfully. As such, I believe the trial court did not abuse its discretion in finding O.H. competent to testify.

¶ 108   For the foregoing reasons, I dissent.