2026 IL App (2d) 240681-U
No. 2-24-0681
Order filed June 9, 2026

**NOTICE:** This order was filed under Illinois Supreme Court Rule 23(b) and is not precedential except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee,

v.

DAVID W. THOMFORDE, Defendant-Appellant.

Appeal from the Circuit Court of McHenry County.
Honorable Michael W. Feetterer, Judge, Presiding.
No. 23-DV-247

PRESIDING JUSTICE KENNEDY delivered the judgment of the court.
Justices Jorgensen and Mullen concurred in the judgment.

**ORDER**

¶ 1   *Held*:  Defendant failed to demonstrate that trial counsel was ineffective for failing to challenge the competency of the six-year-old complaining witness, as defendant could not establish a reasonable probability that such a challenge would have been successful; trial counsel was not ineffective for failing to object to the admissibility of the six-year-old complaining witness's prior statements, as there was no requirement that his trial testimony "accuse" defendant; and trial counsel was not ineffective for failing to preserve its objection to the admissibility of treating physician's testimony that six-year-old complaining witness identified defendant as the perpetrator of his injuries, as it qualified as a statement made for purposes of medical diagnosis or treatment. Affirmed

¶ 2   Defendant David W. Thomforde appeals his conviction of two counts of domestic battery against foster child I.N. For the following reasons we affirm.

¶ 3                                    I. BACKGROUND

¶ 4     On March 12, 2024, the State filed a motion *in limine* to admit evidence of I.N.'s prior statements pursuant to section 115-10 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-10 (West 2024)). On March 26, 2024, the trial court held a hearing on the State's motion. The State argued that it should be allowed to present the evidence of I.N.'s prior statements to Child Advocacy Center interviewer Rosemary Pegau, Alicia Wehby, I.N.'s first alternative foster parent following removal from defendant's home, and Samuel Weyers, I.N.'s subsequent foster parent. Following a hearing, the trial court granted the State's motion on April 26, 2024.

¶ 5     The matter proceeded to jury trial commencing July 15, 2024. The State first called I.N., who testified as follows. After being sworn in, the court asked I.N. to spell his name, which he did. The court asked I.N. if he knew "what telling the truth looks like?" I.N. responded that he did not know. The Court then asked if he knew the difference between a truth and a lie, to which I.N. made no audible response. The court asked if he knew what honesty was and I.N. again gave no audible response. The court then asked if I.N. could answer the parties' questions with answers "telling us they way things actually happened[,]" and I.N. responded, "I think." The court then asked I.N. if the court would be right if it said that today was Halloween, and I.N. responded that would not be right. The court asked if saying that it was Halloween would be a lie, and I.N. said it would be a lie. The court finally asked if I.N. knew the difference between a truth and a lie, and I.N. responded, "I think so."

¶ 6     The State began its questioning by asking I.N. if he knew what city he lived in, and I.N. answered no. The State next asked who he lived with and I.N. answered that he lived with Michelle and Dave, who were his current foster parents. The State next asked I.N. some additional background questions. I.N. knew his birthday and that he was six years old. He testified that he

had a three-year-old younger sister and gave her name. After summer break he was going into first grade but did not know the name of the school he would be attending. During summer break he was attending camp where he made arts and crafts, but he could not remember if he got to play games or sports.

¶ 7    The State then asked if I.N. knew a person named David. I.N. answered yes and indicated his current foster father. When asked if he saw another person named David in court, I.N. said, no. I.N. was asked if he lived with another person named David before living with "Dave and Melissa [*sic*]" (Melissa was defendant's wife and I.N.'s previous foster parent), and he said, no. When asked if anybody ever did anything to his ears that he did not like, I.N. said, no. When asked if he lived with someone named David a couple of years ago, before he lived with "Dave and Melissa [*sic*]," I.N. said no. The State then tendered the witness to the defense, who had no questions on cross-examination.

¶ 8    The State next called Alicia Wehby. Wehby was involved with the local foster care community and had met defendant and Melissa through their involvement with a previous placement. On November 21, 2022, I.N. came into Wehby's care immediately following his removal from defendant and Melissa's home. When I.N. came into her care, Wehby observed bruising to the outside, inner, and top portions of his left ear. The next day Wehby observed that there was also bruising to I.N.'s right ear. That night I.N. did not want to go to bed and was upset. Wehby had pretended that I.N. was stuck in his pajamas to try and get him to laugh. I.N. said, "oww" and grabbed his ears. He told Wehby his dad had grabbed his ears and pulled.

¶ 9    On November 23, Wehby took I.N. to the child advocacy center for a forensic interview. On the way home, I.N. again mentioned that it had hurt when his dad would pull on his ears. I.N.

stayed in Wehby's care for around eight weeks, before being placed with Bree and Sam Weyers. Photographs of the bruises to I.N.'s ears were admitted into evidence.

¶ 10    The State next called Samuel Weyers. He was I.N.'s foster parent for about 11 months beginning in January 2023. When I.N. first came into Weyers's care, Weyers observed that he was very sensitive about his ears. In the winter of 2023, I.N. told Weyers that "David pulled his ears and that it hurt."

¶ 11    The State next called Dr. Jason Layman. On November 22, 2022, Layman was working as an emergency room physician at Northwestern Medicine in Huntley. I.N. and his foster mother came in for an examination. Layman observed suspicious bruising on I.N.'s ears. I.N. told him that his dad had pulled on his ears, that it hurt at the time, but was not hurting anymore. I.N. and his foster mother told Layman that this had occurred the previous night. I.N. observed that the bruises were purplish in color, which was consistent with them being less than three days old. The injuries were inconsistent with being caused by an accident or by I.N. pulling on his ears himself. On cross-examination Layman clarified that the bruising to the ears would have required significant prolonged force, inconsistent with a child pulling on their own ears.

¶ 12    The State next called Rosemary Pegau. Pegau worked as a forensic interviewer at the Child Advocacy Center in McHenry. On November 23, 2022, she interviewed I.N. That interview was recorded, and the recording was admitted into evidence and played for the jury. At the beginning of the interview I.N. is holding a toy train and said "my name is Chugginton[,]" when Pegau asked I.N. his name. Pegau asked I.N. how old he was and he replied, "four." Pegau discussed I.N.'s previous home with him. He told her that Melissa and David Thomforde were his mom and dad, and that he would not be going back to their home anymore. When Pegau asked I.N. to tell her

about his dad, he replied that his dad did not love him. I.N. then asked to go to the bathroom and Pegau and I.N. left the room. Approximately four minutes later they returned to the room.

¶ 13 Pegau began again by prompting I.N. that before going to the bathroom they had been talking about his dad. I.N. responded, "he hurt me." Pegau asked if his dad did something he did not like, and I.N. said, "he pulled my ear like this" and proceeded to pull at the top of his ear. I.N. said that his dad "squooshed" and pulled his ears and that it hurt. I.N. said that this had not happened before and there was nothing else his dad did that he did not like. I.N. then asked what day Christmas Eve was, and Pegau responded that it was about a month away. I.N. then said that "today is Christmas Eve." Pegau asked where I.N. was when defendant pulled his ears. I.N. said he did not know, but that his dad pulled his ears two times.

¶ 14 The State next called Shannon Krueger. Krueger was a MERIT nurse who performed a "paper consult" on I.N.'s case. A paper consult is when a MERIT nurse examines the information gathered during an investigation in order to render an opinion regarding whether the suspected injuries were the result of child abuse or neglect. In her opinion, the injuries to I.N.'s ears were not the result of an accident as they occurred on both of his ears, and accidental play injuries rarely result in bruising to the ears specifically. Further, the injuries were consistent with I.N.'s statements that defendant had pulled his ears.

¶ 15 Detective Bidal Garcia of the McHenry County Sheriff's Office testified as follows. He was the investigator assigned to I.N.'s case. He attended the interview at the Child Advocacy Center. After the interview he spoke with I.N. and took some photographs of the bruising to his ears. As part of his investigation, Garcia spoke with defendant's biological daughter and I.N.'s subsequent foster parents. He attempted to speak with Melissa, but she did not cooperate.

¶ 16    The State rested and defendant called Melissa Thomforde. Melissa was married to defendant. They had a biological daughter and an adoptive son. In November 2022, there were four foster children placed with her and defendant, including I.N. who had been placed with them on June 5, 2021. According to Melissa, I.N.'s ears had less cartilage in them and were floppy. His ears caused him discomfort. He did not like getting haircuts or having anyone near his ears. During the COVID-19 pandemic, it was difficult to keep masks on him as they would fall off of his ears.

¶ 17    On November 21, 2022, the date DCFS came to investigate I.N.'s injuries, Melissa put I.N. on the school bus. While doing so she put a mask and hat on his head and did not observe any bruising. She did observe bruising later that day when DCFS came. On cross-examination, Melissa stated that she was not at home when I.N. returned from school, but defendant was.

¶ 18    Next, defendant testified. He denied pulling I.N.'s ears or that he had touched I.N.'s ears in any of the manners alleged. On cross-examination he acknowledged that he was responsible for I.N.'s care and did not seek medical attention for the injuries to I.N.'s ears.

¶ 19    In rebuttal, the State re-called Wehby, who testified that Melissa told her that between the time the first DCFS investigator came to speak with them and the time that DCFS came to remove the children, they all remembered that I.N. had fallen off a bike and that she believed this is how he obtained his injuries.

¶ 20    The jury found defendant guilty of two counts of domestic battery.

¶ 21    On August 14, 2024, defendant filed a motion for judgment notwithstanding the verdict and for new trial. On October 22, 2024, the trial court denied defendant's motion and sentenced him to 30 days' imprisonment and 24 months' probation. Defendant timely appealed.

¶ 22                                    II. ANALYSIS

¶ 23    On appeal, defendant argues that he received ineffective assistance of counsel. Defendant maintains that trial counsel was ineffective in three ways: (1) trial counsel failed to challenge I.N.'s competency to testify; (2) trial counsel failed to challenge the admissibility of I.N.'s prior statements because his failure to make any accusation against defendant at trial made him unavailable for cross-examination; and (3) trial counsel failed to preserve the challenge to the admissibility of I.N.'s prior statements made to Dr. Layman.

¶ 24    To assert a claim of ineffective assistance of counsel, a defendant must establish that (1) "counsel's representation fell below an objective standard of reasonableness" and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984). A defendant must satisfy both prongs of the *Strickland* test, and a failure to satisfy either prong precludes a finding of ineffectiveness. *People v. Simpson*, 2015 IL 116512, ¶ 34.

¶ 25                          A. I.N.'s Competency to Testify

¶ 26    Defendant argues that trial counsel was ineffective for failing to challenge I.N.'s competency to testify at trial, despite expressing reservations regarding I.N.'s competency and an intention to file a motion challenging I.N.'s competency. Defendant argues that based on I.N.'s answers to the trial court's initial questioning, there was "reason to doubt" I.N.'s ability to adequately understand questions, express his answers, and recollect impressions, as well as the moral duty to tell the truth; and therefore, reason to doubt his competency to testify. Defendant maintains that he was prejudiced by trial counsel's inaction because the only evidence linking defendant to I.N.'s injuries were I.N.'s prior statements admitted under section 115-10 of the Code,

and if I.N. was found incompetent to testify, that would have rendered those statements inadmissible.

¶ 27     The determination of the competency of witnesses in criminal trials is governed by section 115-14 of the Code (725 ILCS 5/115-14 (2024)):

"§ 115-14. Witness Competency. (a) Every person, irrespective of age, is qualified to be a witness and no person is disqualified to testify to any matter, except as provided in subsection (b).

(b) A person is disqualified to be a witness if he or she is:

(1) Incapable of expressing himself or herself concerning the matter so as to be understood, either directly or through interpretation by one who can understand him or her; or

(2) Incapable of understanding the duty of a witness to tell the truth.

(c) A party may move the court prior to a witness' testimony being received in evidence, requesting that the court make a determination if a witness is competent to testify. The hearing shall be conducted outside the presence of the jury and the burden of proof shall be on the moving party."

¶ 28     To establish that he was prejudiced, defendant must show that a reasonable probability existed both that the trial court would have found I.N. incompetent and that the outcome of the trial would have been different. See *People v. Nunez*, 325 Ill. App. 3d 35, 42 (2001) ("To establish the prejudice prong of *Strickland* in the context of a motion to suppress, a defendant must show that a reasonable probability exists both that the motion would have been granted and that the outcome of the trial would have been different had the evidence been suppressed.").

¶ 29    We find our review of defendant's claim to be somewhat hampered. Because trial counsel never challenged I.N.'s competency, the trial court did not conduct a true competency hearing, and therefore never made a definitive determination as to whether I.N. was competent to testify. "The question of a witness's competency is to be determined by the trial judge, and a reviewing court may not disturb such a determination unless it is clear that the trial judge abused his discretion or misapprehended some legal principle." *People v. Mack*, 216 Ill. App. 3d 239, 245 (1991).

¶ 30    The trial court's inquiry of I.N. was directed primarily towards whether he understood the difference between a truth and a lie. While this *sua sponte* inquiry may have been aimed at determining I.N.'s competence, it could have also been intended as a way of reminding I.N. of his duty to tell the truth, or as a way of acclimating I.N. to testifying in court, or some combination of the three.

¶ 31    As with issues of credibility, the trial court is in a superior position to determine the competence of a witness. See *People v. Dempsey*, 242 Ill. App. 3d 568, 583-84 (1993) ("[T]he cold black and white of the record is a poor substitute for the personal observation of the factfinder in determining competency. The demeanor of the witness, while apparent to the trial court, is hidden from a court of review."). For example, in closing arguments, the State made reference to I.N. being excited when he first came into the courtroom, taking the stand, turning his head slightly, seeing the defendant, and his "smile [running] away." Interactions such as these can be vital to informing a trial court's decision but are often hidden from the reviewing court.

¶ 32    Nevertheless, there is nothing to indicate that I.N. was incapable of expressing himself concerning the matter so as to be understood. Defendant asserts that because I.N. had to be prompted to answer questions verbally, and answered that he did not know what he was doing for fun on summer break, did not remember if he got to play any games at summer camp, did not know

the name of the city he lived in or the name of the school he attended, he was incapable of expressing himself so as to be understood. We disagree.

¶ 33   The fact that I.N. needed to be reminded to give his answers out loud has little bearing on whether he was capable of expressing himself. Many adult witnesses also need to be reminded of this. Further, I.N. correctly answered several questions about his life. He could spell his name, and he knew his sister's name and age, his birthday, and what grade he was in. He answered that he did arts and crafts at summer camp. Regarding his school, I.N. stated that he had finished kindergarten and was going into first grade but did not know which school he would be going to at the end of the summer, possibly a new unfamiliar school, as the record is not clear.

¶ 34   Defendant likewise argues that there was reason to doubt whether I.N. understood the duty of a witness to tell the truth, arguing that the trial court's questions were leading and I.N.'s responses were not unequivocal, ultimately concluding with I.N. saying, "I think so[,]" when asked if he knew the difference between a truth and a lie. However, "the competency bar with respect to understanding the difference between a truth and a lie is very low." *People v. Nowicki*, 385 Ill. App. 3d 53, 88 (2008) (collecting cases). When considering a witness's competency, we consider the totality of the witness's responses, and one imperfect response will not invalidate a competency finding. *Dempsey*, 242 Ill. App. 3d at 584.

¶ 35   Defendant compares in the instant case to *People v. Wolfe*, 176 Ill. App. 3d 299, 301 (1988), in which the reviewing court upheld the trial court's finding that the complaining witness was incompetent to testify. In *Wolfe*, the complaining witness:

"knew that she was five years old and that her birthday was in November, but did not know the day of her birth. She could not recall whether she had had a party on her last birthday, nor could she remember what she had done at Christmas. She knew she lived in Illinois,

but she did not know the name of the town. She knew the name of her school, but she could not recall how long she had attended it. While she expressed initial confusion as to what it means to tell the truth, she later gave correct examples of truthfulness and lying." *Id.* at 301.

¶ 36   While there are some factual similarities between the instant case and *Wolfe*, the procedural postures are very different. In *Wolfe*, the trial court had held a competency hearing and found the witness to be incompetent; here no competency hearing was held and no finding was made. The reviewing court in *Wolfe* gave appropriate deference to the findings of the trial court who had the opportunity to observe the witness. In the instant case there are no findings to give deference to, and defendant has the burden of proving that a reasonable probability exists that the trial court would have found I.N. incompetent.

¶ 37   The State argues that the instant case is more similar to *People v. Jackson*, 2015 IL App (3d) 140300, ¶ 47, where the appellate court affirmed the trial court's finding that the four-year-old complaining witness was competent to testify:

> "K.R.L. demonstrated that he knew the difference between the truth and a lie when he said that it would be a lie to say that the book the judge held up was blue because it was actually yellow. K.R.L. promised to tell the truth. K.R.L. was able to state his age, the names of his sisters, and that he lived with his mother and sisters. K.R.L. testified that he remembered going on a helicopter ride because his stomach was hurt. Although K.R.L. did not respond to all of the questions posed to him by counsel and some of his answers were nonverbal, K.R.L. was able to make himself understood when he responded to the questions of counsel and the court." *Id.*

As in *Jackson*, I.N. knew his age, the name of his sister, and who he lived with. Likewise, although some of his responses were non-verbal, I.N. was able to make himself understood when answering the questions posed to him.

¶ 38 In light of the answers given by I.N. at trial, defendant has failed to establish that a reasonable probability exists that the trial court would have found I.N. incompetent to testify. Accordingly, defendant has failed to establish that trial counsel was ineffective for failing to challenge I.N.'s competency.

¶ 39 B. I.N.'s Availability for Cross-Examination

¶ 40 Defendant argues that trial counsel was ineffective for failing to challenge the admissibility of I.N.'s prior statements after he testified at trial because his testimony made no accusations against defendant, thus rendering I.N. unavailable for cross-examination in violation of section 115-10 of the Code and the confrontation clause (U.S. Const. amend. VI). Defendant acknowledged in his brief that this same issue was then being considered by the Illinois Supreme Court. See *People v. Butler*, 2025 IL 130988.

¶ 41 Defendant's arguments primarily rely on the holdings in *People v. Learn*, 396 Ill. App. 3d 891, 919 (2009) ("If the child is the only witness (other than hearsay reporters) who can accuse the defendant of actions constituting the charged offense, the child *must* testify and accuse if she is to be considered to have testified at the proceeding under section 115–10(b)(2)(A). Immaterial or general background 'testimony' is not sufficient." (Emphasis in original.)); and *People v. Kitch*, 239 Ill. 2d 452, 464 (2011) ("[The children's] direct testimony, standing alone, was sufficient to establish the elements of the relevant counts against defendant. We also conclude, largely for this reason, that [their] direct testimony was sufficient to allow for effective cross-examination. Their

direct testimony provided enough detail to allow for cross-examination within the meaning of the confrontation clause.").

¶ 42    However, *Butler* overruled *Learn* and abrogated the holding in *Kitch. Butler*, 2025 IL 130988, ¶¶ 46, 69 ("[I]n *Learn*, the Second District erroneously misconstrued the United States Supreme Court's decision in *Crawford*, 541 U.S. 36, 124 S. Ct. 1354. Accordingly, *** we reject *Learn*'s analysis regarding the *Crawford*-based confrontation clause claims. We therefore overrule *Learn*.") ("Any suggestion in *Kitch*, *** that a defendant's right to confrontation may be denied if a witness's direct testimony is not detailed enough, not sufficiently accusatory, or evasive is contrary to United States Supreme Court precedent and this court's precedent.").

¶ 43    Our supreme court's decision in *Butler* makes it clear that both for the purposes of section 115-10 of the Code and the confrontation clause, "[a] witness is regarded as subject to cross-examination when she is placed on the stand, under oath, and willingly responds to questions." (Internal quotation marks omitted.) *Butler*, 2025 IL 130988, ¶ 78. "Neither section 115-10 nor the confrontation clause requires a child witness to testify to the details of the crime." *Id.* ¶ 69. Likewise, neither section 115-10 nor the confrontation clause requires a child witness to accuse the defendant of an offense while testifying. *Id.* ¶ 62.

¶ 44    In the instant case, I.N. was placed upon the witness stand, sworn in, and willingly answered the questions put to him. Thus, the requirements of section 115-10 of the Code and the confrontation clause were satisfied. Accordingly, trial counsel was not ineffective for not challenging the admissibility of I.N.'s prior statements based upon the content of his trial testimony.

¶ 45                    C. I.N.'s Prior Statements to Dr. Layman

¶ 46    Defendant argues that trial counsel was ineffective for failing to preserve the hearsay objection to Dr. Layman's testimony regarding I.N.'s prior statements by raising them in its post-trial motion. Defendant argues that although Illinois Rule of Evidence 803(4) (eff. Jan. 25, 2023) creates a hearsay exception for statements made for the purposes of medical diagnosis or treatment, statements that identify the person who caused the injury are generally considered to be outside of this exception because the identity of the perpetrator is not pertinent to the patient's diagnosis or treatment. The State responds that while this is generally true, an exception exists for statements made by abused children identifying their abuser.

¶ 47    "On questions of the admissibility of evidence, we will not substitute our judgment for that of the trial court unless the record clearly shows the trial court abused its discretion." *People v. Cookson*, 215 Ill. 2d 194, 213 (2005). "Generally, statements concerning a cause of injury made to a treating physician are admissible under the physician-patient exception to the hearsay rule; however, identification of the offender is outside the scope of the exception." *People v. Davis*, 337 Ill. App. 3d 977, 990 (2003). This is because, generally, the identity of the person who attacked the victim is not necessary to receive proper medical treatment. *Id.* Defendant acknowledges that there is a line of case law which permits the admission of statements made by child sex abuse victims under Illinois Rule of Evidence 803(4) which identify the perpetrator of the abuse. The State maintains that this case law derives from case law regarding the admission of statements from child domestic abuse victims under the analogous Federal Rule 803(4), but the only federal case law cited by the State involves child sexual abuse.

¶ 48    In particular, the parties discuss *People v. Falaster*, 173 Ill. 2d 220, 228 (1996), which concluded that statements made by a child sexual abuse victim to medical personnel identifying

her father as her abuser were admissible under section 115-13 of the Code (725 ILCS 5/115-13 (West 1992))—a statute similar to Rule 803(4) but limited to statements by victims of sex offenses to medical personnel—because the identity of the abuser is often an important element in diagnosing or treating the victim in cases of intrafamily sexual abuse. *Id. Falaster* relied on *United States v. Renville*, 779 F.2d 430, 436 (8th Cir. 1985), which held that "[s]tatements by a child abuse victim to a physician during an examination that the abuser is a member of the victim's immediate household *are* reasonably pertinent to treatment[,]" and therefore admissible under Federal Rule of Evidence 803(4). (Emphasis in original.) *Id.*

¶ 49    The *Renville* court reasoned that (1) "child abuse involves more than physical injury; the physician must be attentive to treating the emotional and psychological injuries which accompany this crime" and (2) physicians have an obligation under the law to prevent abused children from being returned to an abusive environment and "[i]nformation that the abuser is a member of the household is therefore 'reasonably pertinent' to a course of treatment which includes removing the child from the home." *Renville*, 779 F.2d at 437-38. Indeed, Wehby testified at defendant's sentencing hearing that I.N. suffered from PTSD as a result of defendant's abuse. We see no reason why this same reasoning in a case of sexual abuse should not apply equally to instances of physical abuse. See *In re H.B.-H.*, 2025 IL App (1st) 242275, ¶ 77 (minor's statements to doctors regarding adoptive mother's treatment of him, which included forcing him to lick urine out of a bathtub, were made to doctors for the purposes of medical diagnosis and treatment and admissible under Illinois Rule of Evidence 803(4)).

¶ 50    Defendant argues that even if I.N.'s statements to Dr. Layman fell within the exception of Rule 803(4), Dr. Layman's testimony provided no context to establish that I.N.'s statement was made for the purpose of medical diagnosis or treatment. We disagree. This was not a complex

injury. I.N. was taken to see Dr. Layman because his ears were bruised, and I.N. explained that the cause of the bruising was defendant squeezing his ears.

¶ 51 Further, even if it were error to admit I.N.'s statements to Dr. Layman, such error would be harmless, as the testimony was merely cumulative in light of the statements made to Wehby, Weyers, and Pegau. See *In re Brandon P.*, 2014 IL 116653, ¶ 92 (erroneously admitted testimony was harmless error where the statement was merely cumulative of properly admitted testimony).

¶ 52 Accordingly, trial counsel was not ineffective for failing to raise this issue in a posttrial motion.

¶ 53                                     III. CONCLUSION

¶ 54 For the reasons stated, we affirm the judgment of the circuit court of McHenry County.

¶ 55 Affirmed.